IN THE COURT OF APPEALS

FILED BY CLERK

APR 20 2011

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| CITY OF TUCSON, a municipal corporation, | ) ) ) | 2 CA-CV 2010-0083 DEPARTMENT A |
| Plaintiff/Appellant, | ) ) | O P I N I O N |
| v. | ) ) | |
| STATE OF ARIZONA, | ) ) | |
| Defendant/Appellee, | ) ) | |
| and | ) ) | |
| SOUTHERN ARIZONA LEADERSHIP COUNCIL and SENATOR JONATHAN PATON, | ) ) ) ) | |
| Defendant-Intervenors/Appellees. | ) ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20097207

Honorable Michael O. Miller, Judge

REVERSED AND REMANDED

Michael G. Rankin, Tucson City Attorney
 By Dennis McLaughlin                                                    Tucson
                                        Attorneys for Plaintiff/Appellant

Thomas C. Horne, Arizona Attorney General
 By Mary R. O'Grady, Solicitor General, and
 Barbara A. Bailey                                                      Phoenix
                                        Attorneys for Defendant/Appellee

Lewis and Roca LLP
  By S.L. Schorr, Kimberly A. Demarchi, and
  John Hinderaker                                                    Tucson
                                        Attorneys for Defendant-Intervenors/Appellees

_____

H O W A R D, Chief Judge.

¶1          The City of Tucson appeals from the trial court's grant of summary
judgment in favor of appellees State of Arizona, Southern Arizona Leadership Council,
and former state senator Jonathan Paton (collectively "state").  The city argues the court
erred because the Tucson city charter regarding local elections supersedes the
legislature's 2009 amendments to A.R.S. § 9-821.01.  Because the method and manner of
conducting municipal elections is solely a matter of local concern, we reverse and
remand.

**Factual and Procedural Background**

¶2          We view the facts and reasonable inferences from those facts in the light
most favorable to the party against whom summary judgment was granted.  *Andrews v.
Blake*, 205 Ariz. 236, ¶ 12, 69 P.3d 7, 11 (2003).  The City of Tucson is chartered under
the Arizona Constitution.  City council members are nominated by ward but elected by
at-large, general elections, and both the primary and general elections are partisan in
nature.  In 2009, the state enacted a law amending A.R.S. § 9-821.01, which addresses
elections in Arizona's cities and towns.  2009 Ariz. Sess. Laws, ch. 176, § 1.

¶3          Section 9-821.01 now states:

(B) Notwithstanding any other law, a city or town shall not hold any election on candidates for which there is any indication on the ballot of the source of the candidacy or of the support of the candidate.

(C) Notwithstanding any other law, for any city or town that provides for election of city or town council members by district, ward, precinct or other geographical designation, only those voters who are qualified electors of the district, ward, precinct or other geographic designation are eligible to vote for that council member candidate in the city or town's primary, general, runoff or other election.

¶4 Claiming that the amended law would require the city to change its elections process, the city sued the state[1] seeking declaratory and injunctive relief. Appellees Southern Arizona Leadership Council and Paton filed a stipulated motion to intervene in the lawsuit, and the trial court granted their request. The state filed a motion for judgment, and the city responded with a cross-motion for judgment. The parties agreed their motions would be decided as cross-motions for summary judgment. The court then entered summary judgment in favor of the state, and this appeal followed.

**Charter Cities**

¶5 The city argues that the trial court erred in granting summary judgment in favor of the state because several provisions of the city's charter conflict with the prohibition of partisan and at-large municipal elections in § 9-821.01(B) and (C) and the charter supersedes the statute because the issues "relate to matters of purely local concern." The state asserts the statute and charter do not conflict with respect to the

---

[1]The city also sued the governor and the secretary of state in their official capacities, but the city agreed to their dismissal, and they are not parties to this appeal.

prohibition of partisan elections. We review de novo a grant of summary judgment. *Valder Law Offices v. Keenan Law Firm*, 212 Ariz. 244, ¶ 14, 129 P.3d 966, 971 (App. 2006).

¶6 Under the Arizona Constitution, a city with a population over 3,500 is entitled to establish a charter for its government. Ariz. Const. art. XIII, § 2. Our supreme court has held that this charter generally grants a city autonomy over matters of solely local concern. *See, e.g.*, *Strode v. Sullivan*, 72 Ariz. 360, 364-65, 236 P.2d 48, 51 (1951). Thus, if a state law conflicts with the provisions of a city charter and if the relevant interest is solely local, the city's charter supersedes the statute. *Id.* On the other hand, if the interest affected is of statewide concern, the statute will supersede the conflicting provisions of the city charter. *Id.* at 363, 236 P.2d at 50. Therefore, to the extent there is a conflict, we must determine whether the issues are local or statewide.

## Conflict

¶7 The state first argues that there is no conflict between the city's charter and § 9-821.01(B) concerning partisan elections because the charter does not require the city to hold such elections.[2] We consider the pertinent sections of the city's charter to determine whether a conflict exists.

¶8 Chapter XVI, § 2, of the city's charter states, in relevant part:

> The provisions of the general laws of the State of Arizona relating to and governing primary elections and the

---

[2]The state does not dispute that there is a conflict with respect to § 9-821.01(C), which involves ward-based rather than at-large elections.

4

nomination of elective officers, whether by primary or certificate of nomination (being the whole of title 16, Arizona Revised Statutes, 1956, and each and every provision of said title with all amendments and supplements thereto) applicable to a city of the population and the class of this city, shall apply and govern the holding of primaries and nominations of elective officers. The mayor and council shall have power to make any further and additional provisions relating to primaries and nominations of officers not repugnant or contrary to the provisions of the constitution and the laws of the state or any amendments and supplements thereto.

Tucson City Charter, ch. XVI, § 2. Addressing the administration of the city's primary elections and nomination of officers, this section incorporates state election law, found in title 16, A.R.S. *Id.* The state election laws address, inter alia, partisan primary elections. *See, e.g.*, A.R.S. § 16-502(B), (C). And, although the state is correct that the statutes also address nonpartisan nomination of candidates, *see* A.R.S. § 16-314(A), (C), the city charter's incorporation of the statute on partisan elections is sufficient to demonstrate that, at a minimum, the charter permits partisan primaries.

¶9            The state further argues there is no conflict because § 2 of the charter also incorporates the amendments to § 9-821.01 at issue here. But the city contends § 2 does not incorporate § 9-821.01, and its "interpretation of its own Charter is entitled to some weight." *City of Tucson v. State* (*City of Tucson*), 191 Ariz. 436, 437, 957 P.2d 341, 342 (App. 1997). Further, its interpretation is supported by the charter language, which expressly refers to title 16 and incorporates "[t]he provisions of the general laws . . . relating to and governing primary elections and the nomination of elective officers." Tucson City Charter, ch. XVI, § 2. Section 9-821.01 is not a general election law; rather

5

it is directed toward cities and is included in title 9, which is entitled, "Cities and Towns."

Additionally, even if the last sentence required more general compliance with state law, as the state contends, it would apply only to primaries, and the conflict would continue as to the partisan general elections. Therefore, the city's charter does not incorporate § 9-821.01.

¶10        Additionally, § 7 of the charter states:

> The provisions of the general laws of the State of Arizona, governing the elections of state and county officers, not inconsistent with the provisions of this Charter, shall govern the said elections, in matters for which no provision is made in this Charter, or by ordinance, and the mayor and council and clerk, respectively, shall exercise the powers and perform the duties conferred or imposed by such laws on the board of supervisors and clerks of counties concerning elections.

Tucson City Charter, ch. XVI, § 7. But § 7 does not support the state's position because it is a gap-filling provision that incorporates the general election laws concerning state and county offices when there is no counterpart in the city's charter. Section 9-821.01, on the other hand, governs solely municipal elections. Section 7 of the city's charter, therefore, does not incorporate § 9-821.01.

¶11        Thus, at a minimum, and notwithstanding the amendments to § 9-821.01, the city's charter does allow partisan elections through its incorporation of state election law. *See* Tucson City Charter, ch. XVI, §§ 2, 7. And the city has been conducting partisan elections for some time. So the statute's prohibition of partisan elections, in fact, interferes with the city's authority to control its municipal affairs. Because the statute

6

conflicts with provisions of the city's charter concerning both issues, the relevant determination is whether the interests affected are statewide or local.

**Local versus Statewide Concern**

**¶12** The city preliminarily contends we should assess the state's arguments using the test from *Luhrs v. City of Phoenix*, 52 Ariz. 438, 83 P.2d 283 (1938), *City of Tucson v. Tucson Sunshine Climate Club*, 64 Ariz. 1, 164 P.2d 598 (1945), and *McMann v. City of Tucson*, 202 Ariz. 468, 47 P.3d 672 (App. 2002), which considers a city activity to be of statewide interest when the city acts as an agent of the state. *See, e.g.*, *McMann*, 202 Ariz. 468, ¶ 9, 47 P.3d at 676. But this is a proprietary-versus-governmental-activity test, which is not the favored test and is not helpful in determining whether the concern is local or statewide. *See* 2 Eugene McQuillin, *The Law of Municipal Corporations* § 4.85, at 204-05 (3d ed. 1996) (proprietary/governmental test does not address whether matter is of state or local concern). Furthermore, that test was not used in *Strode* or other, more recent supreme court cases. *See Jett v. City of Tucson*, 180 Ariz. 115, 121, 882 P.2d 426, 432 (1994); *Flagstaff Vending Co. v. City of Flagstaff*, 118 Ariz. 556, 559, 578 P.2d 985, 988 (1978); *Strode*, 72 Ariz. at 362-69, 236 P.2d at 50-54. Accordingly, we need not apply this test.

**¶13** In *Strode*, our supreme court did not apply any particular test but stated that it could "conceive of no essentials more inherently of local interest or concern to the electors of a city than who shall be its governing officers and how they shall be selected." 72 Ariz. at 368, 236 P.2d at 54. The court went on to hold "that the method and manner

7

of conducting [municipal] elections . . . [are] peculiarly the subject of local interest and [are] not . . . matter[s] of statewide concern." *Id.* *Strode*, therefore, is the touchstone of our analysis.

¶14        In determining whether a concern is statewide or local, this court does give some deference to a statement of legislative intent. *City of Tucson*, 191 Ariz. at 439, 957 P.2d at 344. But "we must not merely rubber-stamp the legislature's decision." *Ariz. Ctr. for Law in the Pub. Int. v. Hassell*, 172 Ariz. 356, 369, 837 P.2d 158, 171 (App. 1991). The statement of intent reads:

> Arizona courts have recognized that the Constitution of Arizona requires the legislature's involvement in issues relating to elections conducted by charter cities, including initiative and referendum elections, the method of elections other than by ballot, laws relating to primary elections, voter registration laws to prevent abuse and fraud and campaign finance laws. The legislature finds that the conduct of elections described in this section is a matter of statewide concern.

§ 9-821.01(A). But the particular areas of statewide interest identified in the statement do not specifically concern at-large, partisan municipal elections, which are the subject of the amendments to § 9-821.01. *See* § 9-821.01, *as modified by* 2009 Ariz. Sess. Laws, ch. 176, § 1. And the statement does not identify separately what statewide interest "the conduct of elections" in § 9-821.01 purportedly protects. Consequently, our deference in this regard is minimal.[3] *Cf. Wonders v. Pima County*, 207 Ariz. 576, ¶ 9, 89 P.3d 810,

---

[3]*See Hearing on S.B. 1123 Before the H. Comm. of the Whole No. 1, Part 2*, 49th Leg., 1st Reg. Sess. (Ariz. June 29, 2009), http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=5915, at 1:56 (statement of Rep. Antenori, one of the bill's

8

813 (App. 2004) (state law can preempt city ordinance only when intent to preempt clearly stated).

¶15        The state argues, however, that § 9-821.01 seeks to protect statewide interests not described in the statute's statement of intent—preventing voter discrimination and promoting good governance, both of which it contends were raised in legislative debates.   But neither of these issues was included specifically in the legislature's statement of intent.   And "comments of individual legislators 'are not necessarily determinative of legislative intent.'"  *State v. Payne*, 223 Ariz. 555, n.4, 225 P.3d 1131, 1139 n.4 (App. 2009), *quoting Stein v. Sonus USA, Inc.*, 214 Ariz. 200, ¶ 13, 150 P.3d 773, 777 (App. 2007).   Nevertheless, because we would have to determine whether a statute protects a statewide interest even in the absence of a statement of intent, *see Strode*, 72 Ariz. at 362-64, 236 P.2d at 49-51, we consider each issue in turn to determine whether any statewide interests exist that would remove these issues from the holding in *Strode*.

Nonpartisan Elections

¶16        Section 9-821.01(B) requires cities to hold nonpartisan elections.   In *Strode*, our supreme court was considering whether a state law requiring disclosure of partisan affiliations in city council elections would supersede the charter of the City of Phoenix, which required nonpartisan city council elections.  72 Ariz. at 361-62, 236 P.2d

---

sponsors, describing inclusion of finding of statewide interest as "standard boilerplate language that the Rules Attorney says that based on previous court cases he recommends that we place in the bill").

9

at 49-50. The court held "that the method and manner of conducting [municipal] elections . . . [are] peculiarly the subject of local interest and [are] not . . . matter[s] of statewide concern." *Id.* at 368, 236 P.2d at 54. This case is in part the flip side of the *Strode* coin. And we are bound by the decisions of the Arizona Supreme Court. *City of Phoenix v. Leroy's Liquors, Inc.*, 177 Ariz. 375, 378, 868 P.2d 958, 961 (App. 1993). We conclude, therefore, that the concern here is local and that *Strode* controls this issue.

¶17        The state, relying in part on *City of Tucson*, argues that *Strode* does not control because there was an express legislative statement of intent in § 9-821.01 and because *Strode* does not prohibit all legislation affecting municipal elections. In *City of Tucson*, the state had identified a statewide interest in having all elections in the state conducted on four particular days, to increase voter turnout and lower expense. 191 Ariz. at 437, 957 P.2d at 342. The purpose of the legislation, which benefited the state, could not be accomplished unless municipalities complied. *Id.* at 439, 957 P.2d at 344. The nonpartisan requirement in § 9-821.01(B), on the other hand, is directed at municipalities and does not advance any identified statewide interest under *Strode*.

¶18        And the mere presence of a statement of legislative intent is not dispositive. *See City of Tucson*, 191 Ariz. at 439, 957 P.2d at 344 (noting statement of intent entitled to deference; then analyzing magnitude of statewide concern). Furthermore, although *Strode* does not categorically prohibit all legislation regarding local elections, its holding covered one of the precise issues raised here—partisan elections—and went on to state

10

that the "method and manner of conducting [municipal] elections" is primarily an issue of local concern. *See* 72 Ariz. at 368, 236 P.2d at 54.

¶19        The state further contends it has an interest in the effective and efficient local governance that it claims nonpartisan elections promote. But, even if nonpartisan elections may have this effect, the relationship of voters to their municipality is purely a local matter.[4] *See id.*; *Mayor and Common Council of Prescott v. Randall*, 67 Ariz. 369, 371, 196 P.2d 477, 478 (1948) (charter city sovereign in municipal affairs); *City of Tucson v. Walker*, 60 Ariz. 232, 239, 135 P.2d 223, 226 (1943) ("'The purpose of the home rule charter provision of the Constitution was to render the cities adopting such charter provisions as nearly independent of state legislation as was possible.'"), *quoting Axberg v. City of Lincoln*, 2 N.W.2d 613, 614-15 (Neb. 1942). And, based on the constitution, the charter is the "organic law" of the city. Ariz. Const. art. XIII, § 2. So even if the legislature determines generally that nonpartisan elections are a better form of municipal government, Tucson voters have the right to make their own choice in that regard. Consequently, this interest is not sufficient to remove this case from *Strode*'s holding and reasoning. Therefore, the city's charter supersedes § 9-821.01(B), the provision requiring nonpartisan municipal elections.

---

[4]Furthermore, the legislative debates cited by the state do not demonstrate any genuine statewide interest but rather make clear that the legislators were interested solely in changing how Tucson's municipal elections would be conducted.

11

At-Large Elections

¶20        Citing article II, § 21 of the Arizona Constitution, the state asserts it has a constitutionally mandated interest in ensuring the integrity and fairness of the democratic process, which is not diminished depending on whether it involves municipal, as opposed to statewide, elections. *See also* Ariz. Const. art. VII, § 12. The state points out that at-large voting systems have been associated with voting abuses in other jurisdictions, such as vote dilution and voter discrimination, and argues that "[p]rohibiting potentially discriminatory election practices in elections at all levels is a valid and statewide interest." The state further urged at oral argument and also in its supplemental brief that at-large elections pose a statewide concern because a violation of the Voting Rights Act ("VRA") would preclude it from being able to take advantage of the "bailout" provision of 42 U.S.C. § 1973b. The asserted interest is that the city's at-large elections could be found to be in violation of the VRA, preventing the state from making use of the bailout provision. As we already have noted, even in a matter of declared local concern, such as municipal elections, if a statewide concern exists, a statute can supersede a city's charter. *City of Tucson*, 191 Ariz. at 438, 957 P.2d at 343. We must, therefore, determine whether the interests advanced by the state remove this issue from *Strode*'s holding.

¶21        A "bailout" would mean that the state, a "covered jurisdiction," no longer has to seek preclearance from the Department of Justice prior to implementing changes that could impact voting or voter registration. 42 U.S.C. §§ 1973b, 1973c. To invoke this provision, Arizona would be required to show that, for the last ten years, it had not,

nor had any political subdivision within its territory, engaged in any discriminatory voting practice. § 1973b(a). The state would be required to show, inter alia, that it had "eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process." § 1973b(a)(1)(F).

¶22        Section 9-821.01(C), however, is not a blanket prohibition on at-large elections, as the state asserts. It is, rather, a prohibition of the kind of at-large elections currently conducted by the city—ward-based primaries followed by at-large general elections for city council. *See* § 9-821.01(C). The state acknowledges that only Tucson used this system at the time the statute was amended. The record does not show whether any other cities currently conduct at-large elections. But nothing in the statute would prohibit the City of Tucson or any other city from implementing at-large elections. As a result, to the extent that a prohibition on at-large elections may enhance the state's chances of securing a bailout, § 9-821.01(C) does not mandate such a prohibition. Furthermore, the prohibition does not apply to counties. *See id.* Consequently, the measure the legislature enacted does not meaningfully support the state's purported interest under the VRA.

¶23        The state asserts an interest in fair elections outside the VRA. Article II, § 21 of the Arizona Constitution provides that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." And article VII, § 12 of the Arizona Constitution states that "[t]here shall be enacted registration and other laws to secure the purity of elections and guard

13

against abuses of the elective franchise." At-large elections do not always dilute votes and are not per se unconstitutional. *See Thornburg v. Gingles*, 478 U.S. 30, 48 (1986). They have, however, been found in some instances to have a discriminatory effect. *See, e.g.*, *United States v. Charleston County*, 365 F.3d 341, 353 (4th Cir. 2004); *United States v. Blaine County*, 363 F.3d 897, 916 (9th Cir. 2004); *Large v. Fremont County*, 709 F. Supp. 2d 1176, 1228, 1231 (D. Wyo. 2010); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 446 (S.D.N.Y. 2010). But no evidence of such discriminatory effects have been either alleged or shown in Arizona. Furthermore, because the legislature did not meaningfully limit at-large elections, the statute does not combat any potential discriminatory effect, nor does it, therefore, ensure that elections will be "free and equal," Ariz. Const. art. II, § 21, protect the "purity of elections," or "guard against abuses of the elective franchise," Ariz. Const. art. VII, § 12. Consequently, this asserted state interest is not valid and does not support enforcement of this statute against the city.

¶24 The only possible remaining state interest is in preventing the will of the citywide majority from overruling the will of the majority of the ward's electors. But the state has identified no interest in, or any benefit it receives by, preventing this situation from developing in its cities. And this interest again invades the area our supreme court has held to be one of solely local interest—the relationship between the charter city and its voters. *See Strode*, 72 Ariz. at 368, 236 P.2d at 54 ("We can conceive of no essentials more inherently of local interest or concern to the electors of a city than who shall be its

governing officers and how they shall be selected.").[5]  It is up to the supreme court to redefine the limits of the legislative authority in this area, should it choose to do so. Consequently, in light of *Strode*, we hold that § 9-821.01(C) does not apply to the City of Tucson because the state's interests in requiring the city to hold ward-based general elections do not trump the city's charter providing otherwise.

## The Dissent

¶25     Our dissenting colleague concludes that the invocation of the bailout provision of the VRA is a "legitimate" and "strong" state interest.  Although we agree that the VRA could—not would, as our dissenting colleague suggests—provide a satisfactory state interest, in this case it does not.  First, the bailout provision of the VRA was not mentioned in the legislative hearings, the statement of intent, the amendments themselves, the trial court, or the original briefs filed in this appeal.  Rather, it was mentioned for the first time at oral argument.  Consequently, we are not dealing with an expression of legislative intent but with an after-the-fact justification by skillful counsel. We owe no deference to this justification.  *Cf. Wonders v. Pima County*, 207 Ariz. 576, ¶ 9, 89 P.3d 810, 813 (App. 2004) (state law can preempt city ordinance only when legislative intent to preempt clearly stated); *City of Tucson*, 191 Ariz. at 439, 957 P.2d at

---

[5]In its final footnote, the dissent speculates that our supreme court, had it been deciding *Strode* after the passage of the VRA, would have used different language.  The court did consider the issue of city elections after the passage of the VRA and, citing *Strode* with approval, reiterated its position that they are matters of local concern.  *See Triano v. Massion*, 109 Ariz. 506, 508, 513 P.2d 935, 937 (1973) ("Municipal elections are matters of local interest and not matters of statewide concern.").

344 (in determining whether concern is statewide or local, court gives some deference to statement of legislative intent).

¶26 Second, the legislative hearings make it clear that these amendments were an attack on the city's form of government rather than any attempt to protect the state's opportunity to bailout from the preclearance requirements of the VRA. And statements during the hearings make it clear that Tucson is the only city to employ this system and that the bill does not impact counties. Additionally, the record lacks any evidence that the state intends to request that it be relieved from preclearance in the near future,[6] any information on other impediments to the state seeking a bailout, or any other facts necessary for the legislature or this court to resolve whether a valid state interest exists.

¶27 Third, and most importantly, the amendments prohibit at-large elections only when a city or town "provides for election of city or town council members by district." As explained above, the statute does not restrict the entirely at-large elections that have been attacked as discriminatory by the Department of Justice. Therefore, the amendments fail to support the purported justification based on the VRA.

---

[6]It is worth noting that, in support of the United States Attorney General, the state was a party to a recent amicus brief that emphasized the benefits of the Voting Rights Act's preclearance requirements and argued against any assertion that those requirements are onerous or burdensome. Brief for the States of N.C., Ariz., Cal., La., Miss. and N.Y. as Amici Curiae Supporting Appellee, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, ___ U.S. ___, 129 S. Ct. 2504 (2009) (No. 08-322), 2009 WL 815239.

**Conclusion**

¶28      In light of the foregoing, we reverse the trial court's grant of summary judgment in favor of the state and remand the case for entry of summary judgment in favor of the city.


/s/ *Joseph W. Howard*
                 JOSEPH W. HOWARD, Chief Judge


CONCURRING:

/s/ *J. William Brammer, Jr.*
J. WILLIAM BRAMMER, JR., Presiding Judge


E S P I N O S A, Judge, dissenting in part and concurring in part.

¶29      I respectfully disagree with my colleagues' narrow and, in my estimation, somewhat parochial view of what constitutes a legitimate statewide interest with regard to the integrity of Arizona's elections, as well as its conclusion that § 9-821.01(C) does not advance that interest and the requirements of the federal Voting Rights Act (VRA). Due to past voting inequities, Arizona is a "covered jurisdiction" under Section Five of the Act and is one of only nine states subjected to additional scrutiny by the United States Department of Justice (DOJ). *See* 28 C.F.R. pt. 51 app. Accordingly, as a covered jurisdiction, before any law, ordinance, or regulation affecting voting in any of its political subdivisions may be enacted or repealed, the state must either file a declaratory judgment action in United States District Court for the District of Columbia or submit a

17

copy of the enactment to the United States Attorney General, along with explanations, statements, and information required and suggested by 28 C.F.R. § 51.27, and then wait for approval or denial. 42 U.S.C. § 1973c.[7] As the majority acknowledges, in order to be exempted from this preclearance requirement under the so-called "bailout" provision of 42 U.S.C. § 1973b, the state would be required to demonstrate that, for the last ten years, neither it nor any of its political subdivisions had engaged in any discriminatory voting practice, § 1973b(a), and that it had "eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process," § 1973b(a)(1)(F).[8]

¶30        The majority does not truly dispute that satisfying the requirements of the VRA would constitute a valid state interest. And it acknowledges that at-large elections in other jurisdictions have been associated with voting abuses, including vote dilution and voter discrimination. My colleagues conclude, however, that our legislature's expression of the state's interest, § 9-821.01(C), does not "meaningfully support" the state's concern

---

[7]Sections 51.27 and 51.28, 28 C.F.R., identify eighteen items that must be submitted, including statements related to purposes and likely effects of proposed changes, and eight supplemental submissions that are "most likely to be needed with" complex proposals. The supplemental list includes, inter alia, demographic information, records of media coverage, and specific election returns.

[8]Contrary to the majority's assertion, the federal bailout provision was not merely an unheralded "after-the-fact justification by skillful counsel," but instead was prompted by this court's preliminary draft decision, distributed to the parties in advance of oral argument, in which it was observed that only the city, not the state, would be subject to a federal action for a violation of voting rights perpetrated by the city. Moreover, although the state may not have used the word "bailout" in its answering brief, it clearly referred to the preclearance requirement of the Voting Rights Act (VRA) and Arizona's interest in complying with that law.

18

because it is not "a blanket prohibition on at-large elections," but rather is tailored to only one type of at-large election.

**¶31** In my view, this reasoning disregards the preventative obligation imposed both by our state constitution and the VRA and thus misconstrues the state's interest here. As noted above, in order to be relieved of the federal preclearance requirements by way of the bailout provision, the state must demonstrate that neither it nor any political subdivision had engaged in any discriminatory voting practice and show it has "eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process." §§ 1973b(a), 1973b(a)(1)(F). Here, through § 9-821.01(C), the legislature has responded to the only method of at-large voting in the record, which is the method employed in Tucson. In so doing, it has acted to preempt any finding that Tucson has engaged in any discriminatory voting practice through its at-large voting system, a finding that would jeopardize the state's compliance with the Act and eligibility for relief from the preclearance requirements of § 1973c. *See* § 1973b(a). In addition, the legislature has acted to "eliminate[] voting procedures and methods of election which inhibit or dilute equal access to the electoral process," consistent with article VII, § 12 of the Arizona Constitution, which provides: "There shall be enacted registration and other laws to secure the purity of elections and *guard against* abuses of the elective franchise" (emphasis added), and the showing required under the bailout provision. § 1973b(a)(1)(F).

19

¶32 Although the legislature could have prohibited other hypothetical types of at-large voting in addition to addressing an actual situation, it was not required to take such steps under the mandates of the Act. *See* §§ 1973b(a), 1973b(a)(1)(F). Indeed, the scrutiny federal authorities have given various at-large voting schemes in other states was based on actual voting systems currently in place. *See, e.g.*, *Charleston County*, 365 F.3d at 343 (federal suit brought against Charleston County's at-large elections of county council members; voting method alleged to have diluted minority voting strength); *Blaine County*, 363 F.3d at 900 (government alleged Blaine County's "at-large voting system for electing members to the County Commission prevent[ed] American Indians from participating equally in the County's political process"); *Vill. of Port Chester*, 704 F. Supp. 2d at 416 (federal suit alleged Village of Port Chester's at-large voting system for electing members of Port Chester Board of Trustees denied Hispanic population equal opportunity to participate in political process and elect representatives of their choice).

¶33 Moreover, contrary to the majority's theory that the state cannot rely on an interest relating to the VRA because "the statute does not restrict the entirely at-large elections that have been attacked as discriminatory by the DOJ," there is no meaningful way to distinguish the potential discriminatory effect arising from entirely at-large elections from the type of at-large elections taking place in Tucson because they both employ the same potentially discriminatory method. *See Growe v. Emison*, 507 U.S. 25, 40 (1993) ("We have . . . stated on many occasions that . . . at-large plans . . . generally pose greater threats to minority-voter participation in the political process than do single-

20

member districts . . . .").  Significantly, voting systems similar to the one employed in Tucson have been the subject of VRA litigation.  *See, e.g.*, *Badillo v. City of Stockton*, 956 F.2d 884, 886-87 (9th Cir. 1992) (city council voting system used single-district primary elections to advance two most successful candidates from each district to at-large general election where all city voters selected which of the two nominees from each district would serve on council; system "embod[ies] many of the classic devices for reducing a minority's ability to elect representatives").

¶34         Nor is the legislature prevented from later addressing other types of at-large voting that may be implemented by Tucson or other cities.  Thus, contrary to the majority's reasoning, that § 9-821.01(C) does not contain a "blanket prohibition" of at-large elections does nothing to undermine the fact that the legislation has furthered the state's ability to guard against discriminatory election practices as well as comply with the Act and qualify for its bailout provision.[9]  Stated differently, under the majority's

---

[9]As the majority decision recognizes, whether the legislature articulates a specific interest, or, as in this case, one that is *sufficiently* specific, is not dispositive of whether the legislation in fact furthers a valid state interest.  *See City of Tucson*, 191 Ariz. at 439, 957 P.2d at 344; *cf. Lerma v. Keck*, 186 Ariz. 228, 233, 921 P.2d 28, 33 (App. 1996) (in determining whether legislation advances legitimate interest for purposes of equal protection challenge, court may consider not only legislature's articulated purpose, but any hypothetical basis for enacting legislation).  Furthermore, while the majority gleans from the legislative history a comment of one sponsor that appears to undermine the expressed purpose of the statute's declaration of intent, it ignores the statements of another, whose exhortations to legislative committees went to the heart of the issue here, specifically invoking the potential for voting abuses under at-large elections and the VRA.  *See Hearing on S.B. 1123 Before the H. Comm. on Judiciary*, 49th Leg., 1st Reg. Sess. (Ariz. June 25, 2009), http://azleg.granicus.com/MediaPlayer.php?view_id=16& clip_id=5817, at 2:28-2:30 (statement of Sen. Jonathan Paton, co-sponsor of S.B. 1123); *Hearing on S.B. 1123 Before the S. Comm. on Judiciary*, 49th Leg., 1st Reg. Sess. (Ariz.

reasoning, the state cannot protect and further its own interest by addressing a specific potential harm of which it is aware unless, at the same time, it also addresses all types of other potential and theoretical types of harm as well.

¶35　　　　Because I conclude § 9-821.01(C) furthers valid state interests, and because the majority does not reach the issue of whether the state's compliance with the bailout provision is a legitimate statewide concern, I offer this additional discussion.

¶36　　　　As noted earlier, both the Arizona Constitution and federal law serve as incentives to our state legislature to prevent voting abuses. *See* Ariz. Const. art. VII, § 12 ("There shall be enacted registration and other laws to secure the purity of elections and guard against abuses of the elective franchise."); 42 U.S.C. § 1973b (outlining bailout standards). Were the state able to meet the terms and added requirements of § 1973b it could seek a declaratory judgment exempting it from the burdens of the preclearance process required by § 1973c. *See Nw. Austin Mun. Util. Dist. No. One*, ___ U.S. at ___, 129 S. Ct. at 2508 (observing preclearance and bailout requirements impose "rigorous conditions").[10] I see no reason why the state legislature, acting pursuant to its state

June 8, 2009), http://azleg.granicus.com/MediaPlayer.php? view_id=16&clip_id=5557, at 6-7 (same).

[10]The majority's discovery of an unrelated 2009 amicus brief in which the former Arizona Attorney General joined in describing the federal preclearance process as "not plac[ing] an onerous burden on states" in view of its "allowing our Nation to make substantial progress toward eliminating voting discrimination" in no way diminishes the validity of this compelling state interest. Brief for the States of N.C., Ariz., Cal., La., Miss. and N.Y. as Amici Curiae Supporting Appellee, *Nw. Austin Mun. Util. Dist. No. One*, ___ U.S. ___, 129 S. Ct. 2504 (No. 08-322), 2009 WL 815239, at *1. Moreover, whenever preclearance is required, there is potential for significant burden and delay. For example, in 2002, Arizona submitted a proposed redistricting plan to the Department

constitutional duty to protect elections, need wait for a challenge or pronouncement from the federal government that the at-large voting system as practiced in Tucson is discriminatory and constitutionally deficient before forbidding it. Indeed, in light of the purposes of, and consequences under, the VRA, *see* 42 U.S.C. §§ 1973, 1973a, restricting the state from enacting targeted legislation to prevent such a finding before it occurs seems counterproductive and at odds with the spirit of federal and state efforts to protect voting rights. Although the majority relies heavily on *Strode*, when there is a valid statewide concern, as I believe to be the case here, *Strode* mandates that the statute supersede the conflicting city charter.[11] 72 Ariz. at 363, 236 P.2d at 50; *see also City of Tucson*, 191 Ariz. at 438, 957 P.2d at 343.

---

of Justice (DOJ) for preclearance, but a decision was delayed for months by the DOJ's request for additional information. *See Navajo Nation v. Ariz. Indep. Redistricting Comm'n*, 230 F. Supp. 2d 998, 1002-04 (D. Ariz. 2002). This meant that candidates, who faced imminent deadlines for collecting signatures, qualifying for public contributions, and filing petitions, did not know which district boundaries to use. *Id.* Affected parties and entities appealed to the state legislature for assistance, which responded by enacting an emergency measure addressing the situation. But this legislation also had to be submitted to the DOJ for preclearance, leading to litigation in federal court. *Id.* The DOJ ultimately denied the plan, and additional changes had to be adopted before it was finally approved. *Id.* at 1004.

[11]Although my colleagues repeatedly rely on our supreme court's language in *Strode* that it could "conceive of no essentials more inherently of local interest or concern to the electors of a city than who shall be its governing officers and how they shall be selected," 72 Ariz. at 368, 236 P.2d at 54, this 1951 case was decided over ten years before the enactment of the VRA. Had this sweeping federal legislation, which made states accountable for the voting practices of their political subdivisions, been in effect at the time, it is possible, if not likely, the *Strode* court would have tempered some of its broad language. In any event, *Strode* supports the result reached by the trial court here in light of the legitimate state interest at stake. *See id.* at 363, 236 P.2d at 50. The majority's additional citation to *Triano*, decided after passage of the VRA, is inapposite.

23

¶37 Because the at-large voting prohibition in § 9-821.01(C) was enacted pursuant to a strong statewide interest informed by federal law and state constitutional mandate, Tucson's city charter does not trump § 9-821.01(C). Accordingly, the trial court did not err in so finding and I would affirm this portion of its order granting summary judgment.

/s/ *Philip G. Espinosa*

PHILIP G. ESPINOSA, Judge

---

*Triano* dealt with candidates' residency requirements and did not implicate the state's compliance with federal law. 109 Ariz. at 508, 513 P.2d at 937.