SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| CITY OF TUCSON, a municipal corporation, | ) ) ) | Arizona Supreme Court No. CV-11-0150-PR |
| Plaintiff/Appellant, | ) ) | Court of Appeals Division Two |
| v. | ) ) | No. 2 CA-CV 10-0083 |
| STATE OF ARIZONA, | ) ) | Pima County Superior Court |
| Defendant/Appellee, | ) ) | No. C20097207 |
| and | ) ) | |
| SOUTHERN ARIZONA LEADERSHIP COUNCIL and SENATOR JONATHAN PATON, | ) ) ) ) | **O P I N I O N** |
| Defendant-Intervenors/Appellees. | ) ) ) | |
| _____ | ) | |

Appeal from the Superior Court in Pima County
The Honorable Michael Owen Miller, Judge

**REVERSED AND REMANDED**

_____

Opinion of the Court of Appeals, Division Two
226 Ariz. 474, 250 P.3d 251 (App. 2011)

**VACATED**

_____

THOMAS C. HORNE, ARIZONA ATTORNEY GENERAL                    Phoenix
    By    James E. Barton II
          David R. Cole, Solicitor General
Attorneys for State of Arizona

MICHAEL G. RANKIN, TUCSON CITY ATTORNEY                       Tucson
    By    Dennis P. McLaughlin, Principal Assistant
          City Attorney
Attorneys for City of Tucson

LEWIS AND ROCA LLP                                          Tucson
     By   John Hinderaker
          Jeffrey L. Sklar
          S.L. Schorr
          Kimberly A. Demarchi                           Phoenix
Attorneys for Southern Arizona Leadership Council and
Jonathan Paton

BERKE LAW FIRM, PLLC                                       Phoenix
     By   Ellen M. Van Riper
Attorney for Amicus Curiae League of Arizona Cities and Towns
_____

**B A L E S**, Justice

¶1      Since statehood, Arizona's Constitution has included a "home rule" provision authorizing eligible cities to adopt charters.  Ariz. Const. art. 13, § 2.  A charter city has the power to frame its own organic law, including the power to determine "who shall be its governing officers and how they shall be selected."  *Strode v. Sullivan*, 72 Ariz. 360, 368, 236 P.2d 48, 54 (1951).  Based on these principles, we hold that A.R.S. § 9-821.01, as amended in 2009, does not displace the method that voters of the City of Tucson chose under its 1929 charter for electing council members.

**I.**

¶2      Tucson city council members are nominated in ward-based primary elections but elected in at-large (city-wide) general elections.  These elections are partisan: the primary selects nominees for particular political parties and the general election ballot identifies candidates by party

2

affiliation. Tucson has used this system since adopting its current city charter in 1929.

¶3      In 2009, the Arizona Legislature amended A.R.S. § 9-821.01 to provide that cities and towns "shall not hold any election on candidates for which there is any indication on the ballot of the source of the candidacy or of the support of the candidate." *Id.* § 9-821.01(B); 2009 Ariz. Sess. Laws, ch. 176, § 1 (1st Reg. Sess.). The same amendment added § 9-821.01(C), stating:

> Notwithstanding any other law, for any city or town that provides for election of city or town council members by district, ward, precinct or other geographical designation, only those voters who are qualified electors of the district, ward, precinct or other geographic designation are eligible to vote for that council member candidate in the city or town's primary, general, runoff or other election.

As amended, § 9-821.01 thus bars a city from electing its city council in partisan elections or in ward-based primaries combined with at-large general elections.

¶4      The City of Tucson filed this case against the State, claiming that the amendments to § 9-821.01 do not apply to it as a charter city. The Southern Arizona Leadership Council and former Senator Jonathan Paton (collectively "SALC") intervened as defendants. On cross-motions for summary judgment, the superior court entered judgment for the State.

3

¶5        A divided court of appeals reversed, ruling that A.R.S. § 9-821.01 conflicts with the Tucson Charter and that the city's method of selecting its council members is a purely local issue that cannot be preempted by state law. *City of Tucson v. State*, 226 Ariz. 474, 476-80 ¶¶ 7-24, 250 P.3d 251, 253-57 (App. 2011). The dissenting judge concluded that the legislature can displace Tucson's use of a ward-based primary combined with an at-large general election. *Id.* at 481-84 ¶¶ 29-37, 250 P.3d at 258-61 (Espinosa, J., dissenting in part and concurring in part).

¶6        We granted review because this case involves legal issues of statewide importance. The Court has jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2009).

## II.

### A.

¶7        Nineteenth century case law and legal commentary generally viewed cities and towns as entirely subordinate to and dependent on the state's legislature for any governmental authority. *See*, *e.g.*, Lynn A. Baker & Daniel B. Rodriguez, *Constitutional Home Rule and Judicial Scrutiny*, 86 Den. U. L. Rev. 1337, 1340 (2009) (noting "near consensus view" that "municipalities had only those powers delegated to them by state legislatures"); David J. Barron, *Reclaiming Home Rule*, 116 Harv.

4

L. Rev. 2255, 2277-88 (2003) (describing nineteenth century views of local government and rise of home rule movement).

¶8      The framers of Arizona's Constitution, however, rejected that view, valuing local autonomy. *See* Toni McClory, *Understanding Arizona's Constitution* 178 (2d ed. 2010). Accordingly, Arizona's Constitution bars the state legislature from enacting "local or special laws" with respect to "[i]ncorporation of cities, towns, or villages, or amending their charters," Ariz. Const. art. 4, pt. 2, § 19(17), and requires "the legislature, by general laws, [to] provide for the incorporation and organization of cities and towns and for the classification of such cities and towns in proportion to population." *Id.* art. 13, § 1.

¶9      More importantly, our Constitution also permits any city of more than 3500 people to "frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the state." *Id*. art. 13, § 2. "The purpose of the home rule charter provision of the Constitution was to render the cities adopting such charter provisions as nearly independent of state legislation as was possible." *City of Tucson v. Walker*, 60 Ariz. 232, 239, 135 P.2d 223, 226 (1943) (quoting *Axberg v. City of Lincoln*, 2 N.W.2d 613, 614–15 (Neb. 1942)).

¶10     Upon approval by the city's voters and the governor, the "charter shall become the organic law of such city and supersede any charter then existing (and all amendments thereto), and all ordinances inconsistent with said new charter." Ariz. Const. art. 13, § 2. Thus, under Arizona's Constitution, eligible cities may adopt a charter – effectively, a local constitution – for their own government without action by the state legislature. "[A] home rule city deriving its powers from the Constitution is independent of the state Legislature as to all subjects of strictly local municipal concern." *City of Tucson v. Tucson Sunshine Climate Club*, 64 Ariz. 1, 8-9, 164 P.2d 598, 602 (1945); *see Buntman v. City of Phoenix*, 32 Ariz. 18, 25-27, 255 P. 490, 492-93 (1927) (holding that city charter provided legislative authorization for municipal operation of railway under Ariz. Const. art. 2, § 34); *The Records of the Arizona Constitutional Convention of 1910* 515 (John S. Goff ed., 1991) [hereinafter Records] (statement of sponsoring delegate noting that charter provision relieved cities of need "to go to the legislature for a charter"); John D. Leshy, *The Arizona State Constitution* 265-66 (1993).

¶11     There are nineteen "charter cities" in Arizona, ranging from Yuma in the southwest to Holbrook in the northeast, and including the former territorial capital Prescott, Flagstaff, the border cities Nogales and Douglas, and several

cities in the greater Phoenix metropolitan area.[1]  Each city has a distinctive charter establishing the structure of its government and identifying its various city officials and their manner of selection.  *See* Arizona League of Cities and Towns, Charter Government Provisions in Arizona Cities 12-15 (2005) [hereinafter Charter Government] (tables comparing cities in governmental structure).  In contrast, some seventy-one non-charter municipalities are governed by general statutes concerning local government.  McClory, *supra* ¶ 8, at 178; *see* Jan Brewer, The Arizona Blue Book 160-70 (2007-08 ed.) (listing incorporated Arizona cities and towns in 2007).

**B.**

¶12     Arizona charter cities differ significantly in how they elect their city councils.  Before statehood, cities generally selected council members – then referred to as aldermen - by wards, that is, each was elected from a particular district within the city.  *See* 1901 Territorial Code § 625 (providing for election of two aldermen from each ward).  But the Progressive reform movement that influenced the framing of Arizona's Constitution, *see*, *e.g.*, McClory, *supra* ¶ 8, at 25-26,

---

[1]     The charter cities are Avondale, Bisbee, Casa Grande, Chandler, Douglas, Flagstaff, Glendale, Goodyear, Holbrook, Mesa, Nogales, Peoria, Phoenix, Prescott, Scottsdale, Tempe, Tucson, Winslow, and Yuma.  McClory, *supra* ¶ 8, at 178 & n.31.

7

also affected municipal government. Groups such as the National Municipal League (now the National Civic League) advocated for the election of city councils in at-large, nonpartisan elections, contending that ward-based election systems resulted in city governments susceptible to control by "political bosses," corruption, and parochial neighborhood interests. *See id.* at 179-80; H. George Frederickson, Curtis Wood, & Brett Logan, *How American City Governments Have Changed: The Evolution of the Model City Charter*, 90 Nat'l Civic Rev. 3 (2001).

¶13    Many of Arizona's charter cities adopted at-large elections for their city councils, and twelve currently use this method. Charter Government at 12-15. Over time, however, there has been renewed support for district-based council elections. Proponents contend that at-large elections may be used to deny representation to particular groups, such as concentrated populations of minority or low-income residents, or may result in the neglect of neighborhood interests.

¶14    Some cities that had adopted at-large elections later reinstituted district-based elections. Phoenix, for example, adopted at-large elections in 1948 as part of a "good government" reform effort. *See* Carl Abbott, *The New Urban America* 142 (1981). In 1982, Phoenix voters amended its charter to restore district-based council elections after a grassroots campaign argued this change would increase minority and

8

neighborhood representation.  McClory, *supra* ¶8, at 181; *see also* Carl Abbott, *The Metropolitan Frontier* 104-07 (1993) (describing adoption of district-based council elections in various western cities, including Phoenix).  Six of Arizona's charter cities now elect their city councils on a district or ward basis.  Charter Provisions at 11.[2]

¶15     Arizona's Constitution and statutes regarding municipalities do not express a preference between at-large or district-based council elections.  *See generally* A.R.S. §§ 9-232.04, 9-273 (allowing non-charter cities and towns to choose between at-large and district-based council elections).  This flexibility recognizes that each form of election has possible advantages and disadvantages; for example, although at-large members are responsible to electors in the entire city, this may diminish attention to the interests of particular neighborhoods or groups; district-based elections, in contrast, assure representation from different geographic areas but may elevate particular interests over citywide ones.

---

[2]     Nationally, more than 64 percent of municipalities use at-large council elections in some way, while about 14 percent use district-based elections and 21 percent use a combined system. *See* National League of Cities, Cities 101: Municipal Elections (2010), *available at* www.nlc.org/build-skills-networks/resources/cities-101/municipal-elections.

¶16    Tucson is unique among Arizona's charter cities in its method for selecting council members. Adopted in 1929, the Tucson charter provides:

> Beginning in the year 1930, and continuing thereafter, the mayor shall be nominated from and elected by the voters of the city at large, and the councilmen shall be nominated each from, and by the respective voters of, the ward in which he resides, and shall be elected by the voters of the city at large.

Tucson City Charter Chapter XVI, § 9. The primary and general elections for council members are partisan. Tucson thus uses a hybrid election system: Council members are nominated by ward, so that the council includes members from different geographic regions of the city, *see id.* § 5, but they are elected by all the city's voters in the general election.

¶17    In November 1991, Tucson voters rejected a proposal to replace at-large general elections with district-based elections. Two years later, they rejected a proposal to change from partisan to non-partisan elections.

### C.

¶18    More than sixty years ago, this Court considered a charter city's authority to structure its own government in *Strode*, which involved the non-partisan election system that Phoenix adopted in 1912. *See* Phoenix City Charter Chapter XII (1912). State statutes then generally entitled political parties to be represented on ballots for state, county, and city

10

offices.  *Strode* at 361-62, 236 P.2d at 49-50.  The Court, however, held that these statutes did not displace the Phoenix charter, which provided that "nothing on the ballot shall be indicative of the source of the candidacy or the support of any candidate."  *Id.* at 363, 236 P.2d at 50 (quoting Phoenix City Charter Chapter XII, sec. 9).

¶19     *Strode* recognized that Article 13, Section 2 requires city charters to be "consistent with, and subject to, the Constitution and the laws of the state."  This provision, the Court held, does not subject charter cities to the legislature's plenary power.  72 Ariz. at 365, 236 P.2d at 51.  Instead, the phrase "laws of the state" refers to laws addressing matters of "statewide interest" rather than "local concern."  *Id.* (citing *City of Wewoka v. Rodman*, 46 P.2d 334, 335 (Okla. 1935)).  Reviewing prior decisions, the Court in *Strode* explained:

> [T]his court has uniformly held that a city charter, when regularly adopted and approved, becomes the organic law of the city and the provisions of the charter supersede all laws of the state in conflict with such charter provisions insofar as such laws relate to purely municipal affairs.

*Id.* at 365, 236 P.2d at 51; *see also City of Tucson v. Walker*, 60 Ariz. at 239, 135 P.2d at 226 (observing that "where the legislative act deals with a strictly local municipal concern, it can have no application to a city which has adopted a home rule charter") (quoting *Axberg*, 2 N.W.2d at 615.).

11

¶20    Consistent with earlier decisions, the Court in *Strode* applied a formalistic analysis: whether general state laws displace charter provisions depends on whether the subject matter is characterized as of statewide or purely local interest.  72 Ariz. at 365, 236 P.2d at 51.  This approach can be problematic in application.  *See* Note, *Conflicts between State Statutes and Municipal Ordinances*, 72 Harv. L. Rev. 737, 740-43 (1959) (discussing challenges courts have faced in identifying "exclusively local" matters subject to municipal home rule).  The concepts of "local" versus "statewide" interest do not have self-evident definitions.  Many municipal issues will be of both local and state concern, and distinguishing between matters that are properly subject to local versus state control often involves case-specific line drawing.  *Strode* recognized as much, noting that "[s]ome difference of opinion is evidenced in the reported cases as to what activities of a charter city are of local interest or concern and therefore free from legislative interference."  72 Ariz. at 366, 236 P.2d at 52; *cf.* Baker & Rodriguez, *supra* ¶ 7, at 1344 (observing that the task of discerning what is or is not a local affair is "necessarily ad hoc").

¶21    But whatever the general difficulties in identifying matters of local concern, *Strode* is absolutely clear that

12

charter city governments enjoy autonomy with respect to structuring their own governments.

> The framers of the Constitution, in authorizing a qualified city to frame a charter for its own government, certainly contemplated the need for officers and the necessity of a procedure for their selection. These are essentials which are confronted at the very inception of any undertaking looking toward the preparation of a governmental structure. *We can conceive of no essentials more inherently of local interest or concern to the electors of a city than who shall be its governing officers and how they shall be selected.*

72 Ariz. at 368, 236 P.2d at 54 (emphasis added).

¶22    Underscoring this point, the Court said: "We therefore specifically hold that the method and manner of conducting elections in the city of Phoenix is peculiarly the subject of local interest and is not a matter of statewide concern." *Id.* Accordingly, the state statutes providing for partisan ballots did not displace the Phoenix charter provisions for non-partisan elections.

¶23    This Court subsequently relied on *Strode* in a case involving Tucson city elections. In *Triano v. Massion*, a prospective candidate argued that the one-year residency requirement in Tucson's charter conflicted with a state statute merely requiring candidates to reside in the district they proposed to represent. 109 Ariz. 506, 513 P.2d 935 (1973). Upholding Tucson's residency requirement, the Court confirmed that "[m]unicipal elections are matters of local interest and

13

not matters of statewide concern."  *Id*. at 508, 513 P.2d at 937 (citing *Strode*, 72 Ariz. 360, 236 P.2d 48).

## III.

¶24    With this background, we consider whether A.R.S. § 9-821.01 displaces the method that Tucson has used under its 1929 charter to elect its city council.

## A.

¶25    SALC and the State first argue that the prohibition on partisan elections in § 9-821(B) should apply to Tucson because its charter does not require partisan council elections but instead incorporates the state's general laws.

¶26    Tucson's charter does incorporate certain state election laws.  With respect to primary elections, the charter provides:

> The provisions of the general laws of the State of Arizona relating to and governing primary elections and the nomination of elective officers, whether by primary or certificate of nomination (being the whole of title 16, Arizona Revised Statutes, 1956, and each and every provision of said title with all amendments and supplements thereto) applicable to a city of the population and the class of this city, shall apply and govern the holding of primaries and nominations of elective officers.

Tucson City Charter Chapter XVI, § 2.  The Tucson charter also states that "[t]he provisions of the general laws of the State of Arizona, governing the elections of state and county

14

officers, not inconsistent with the provisions of this Charter, shall govern the said elections . . . ." *Id*. § 7.

¶27     The charter provisions, however, do not incorporate § 9-821.01(B). This statute is not part of Title 16's provisions "relating to and governing primary elections and the nomination of elective officers." *Id.* § 2. Nor is it among the state's general laws governing the elections of state and county officers. Instead, the charter's reference to the state's general laws regarding "primary elections and the nomination of elective officers" is more reasonably interpreted as contemplating partisan elections. *See* A.R.S. § 16-311(A) (providing for partisan nominations in a "primary election"); *id.* § 16-311(B) (providing selection process for "nonpartisan elections").

¶28     Tucson has conducted partisan elections for its city council for over eighty years. Tucson's charter at the least permits partisan elections, and thus conflicts with § 9-821.01(B), which forbids them.

¶29     Moreover, § 9-821.01(C), as SALC and the State acknowledge, plainly conflicts with Tucson's charter in another respect. The statute bars a city that uses a ward-based primary for council members from using an at-large general election. *Id.* Tucson's charter states that "councilmen shall be nominated each from, and by the respective voters of, the ward in which he

15

resides, and shall be elected by the voters of the city at large." Tucson City Charter Chapter XVI, § 9.

**B.**

¶30 Under *Strode*, Tucson's manner of electing its city council members supersedes the conflicting provisions of A.R.S. § 9-821.01(B) and (C). The Court held in *Strode* that the City of Phoenix could select its council in nonpartisan elections. If the local autonomy granted by Article 13, Section 2 allows a city to opt not to use partisan elections, the converse must also be true: a city may choose to use partisan elections.

¶31 *Strode*'s rationale also extends to Tucson's decision to use ward-based primaries and at-large general council elections. In characterizing the method of electing city officers as a "purely municipal concern," *Strode* noted that the framers of our Constitution allowed charter cities to structure their own governments. 72 Ariz. at 368, 236 P.2d at 54. The Court could "conceive of no essentials more inherently of local interest or concern to the electors of a city than who shall be its governing officers and how they shall be selected." *Id*. If the "home rule" provisions of Article 13, Section 2 are to have effect, they must at the least afford charter cities autonomy in choosing how to elect their governing officers.

¶32 We therefore must consider whether there is reason to reconsider or qualify *Strode*'s holding that "the method and

manner of conducting elections" for a charter city "is peculiarly the subject of local interest and is not a matter of statewide concern." *Id*. at 368, 236 P.2d at 54.

**¶33** The State argues that we should defer to the legislature's finding in A.R.S. § 9-821.01(A) that "the conduct of elections described in this section is a matter of statewide concern." The statute also declares:

> Arizona courts have recognized that the Constitution of Arizona requires the legislature's involvement in issues relating to elections conducted by charter cities, including initiative and referendum elections, the method of elections other than by ballot, laws relating to primary elections, voter registration laws to prevent abuse and fraud and campaign finance laws.

*Id.* The State notes that no similar findings were present in *Strode*.

**¶34** For several reasons, § 9-821.01(A) does not cause us to reassess *Strode*. Although we respect findings by the legislature, whether state law prevails over conflicting charter provisions under Article 13, Section 2 is a question of constitutional interpretation. *See City of Tucson v. Walker*, 60 Ariz. at 238-39, 135 P.2d at 226-27; *cf. Forty-Seventh Legislature of State v. Napolitano*, 213 Ariz. 482, 485 ¶ 8, 143 P.3d 1023, 1026 (2006) (noting that courts are ultimately responsible for interpreting the constitution). The issue is not whether the legislature acted constitutionally in enacting § 9-821.01(A)-(C); we presume that it did and assume, without

17

deciding, that the statute applies to non-charter cities. We must instead determine whether, notwithstanding this statute, the constitution affords charter cities autonomy in structuring the elections of their governing councils.

¶35    We do not question that some aspects of the conduct of local elections may be of statewide concern. *See, e.g.*, *City of Tucson v. State*, 191 Ariz. 436, 439, 957 P.2d 341, 344 (App. 1997) (finding statewide interest in specifying uniform dates for municipal elections). But election dates, other administrative aspects of elections, and the various examples listed in § 9-821.01(A) all involve matters qualitatively different from determining how a city will constitute its governing council.

¶36    The State also contends that the federal Voting Rights Act ("VRA"), 42 U.S.C. § 1973 (2006), creates a statewide interest in barring Tucson's use of at-large council elections. Since the 1975 amendments to the VRA, Arizona has been a "covered jurisdiction": the state and its political subdivisions must seek federal approval (preclearance) under section 5 of the VRA before implementing any change affecting voting. *See* 42 U.S.C. § 1973c; 28 C.F.R. §§ 51.26-51.28.

¶37    To be relieved of the preclearance requirement, Arizona must show that, for the last ten years, neither it nor any of its political subdivisions has engaged in any

18

discriminatory voting practice. *See* 42 U.S.C. § 1973b(a)(3). The State also would have to show that it and "all governmental units within its territory . . . have eliminated voting procedures and methods of election which inhibit or dilute equal access to the electoral process." 42 U.S.C. § 1973b(a)(1)(F). The State argues that Tucson's continued use of at-large elections might jeopardize Arizona's ability to be relieved from the preclearance requirements because at-large council elections have sometimes been found to violate the VRA.[3]

¶38    The VRA, however, does not alter *Strode*'s analysis of the relative power of the state legislature and charter cities regarding the structure of city government. Tucson undeniably must comply with applicable federal law. But at-large elections do not necessarily violate either the federal constitution or the VRA. *See Thornburg v. Gingles*, 478 U.S. 30, 48 (1986). The State does not claim, nor is there any evidence in the record suggesting, that Tucson's method of selecting its city council violates the VRA. Indeed, Tucson has elected minority council members for decades and two of its current council members are Hispanic.

---

[3] At-large elections for city councils violate § 2 of the Voting Rights Act when they deny minority voting rights. *See*, *e.g.*, *United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 446 (S.D.N.Y. 2010); *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 732 (N.D. Tex. 2009).

19

¶39 Concerns to prevent possible violations of the VRA do not support A.R.S. § 9-821.01(C) trumping Tucson's charter. The statute does not affect the many Arizona municipalities that use at-large elections for both primaries and general elections, and Tucson could satisfy the statute's requirements by retaining its at-large general election while abandoning ward-based primaries.

¶40 We also reject the State's suggestion that the Arizona Constitution, as interpreted in *Strode*, somehow changed as a result of Congress's enactment of the VRA in 1965 and the extension of the preclearance requirements to Arizona in 1975. Although congressional enactments can preempt state law under the Supremacy Clause, U.S. Const. art VI, there is no contention that Congress has preempted the home rule provisions in Arizona's Constitution, and we do not believe the VRA impliedly amended them. If Arizona's Constitution has become outdated in its respect for local autonomy, it is up to Arizona's voters to approve any amendment.

¶41 Independent of the VRA, the State contends that § 9-821.01 involves matters of statewide concern because it promotes "equality in the democratic process." Arizona's Constitution recognizes that "governments derive their just powers from the consent of the governed," art. 2, § 2, and provides that "[a]ll elections shall be free and equal, and no power, civil or military, shall at any time interfere to prevent the free

20

exercise of the right of suffrage." Art. 2, § 21. Article 7, Section 12 of the Constitution states that "[t]here shall be enacted registration and other laws to secure the purity of elections and guard against abuses of the elective franchise."

¶42 Some state courts have held that legislatures may require home-rule cities to adopt district-based elections for city councils. *See, e.g.*, *Jacobberger v. Terry*, 320 N.W.2d 903 (Neb. 1982); *Casuse v. City of Gallup*, 746 P.2d 1103 (N.M. 1987). Other state court decisions, like *Strode*, have recognized that aspects of municipal elections are of local concern, although some of these decisions concern constitutional provisions that specifically empower cities to regulate municipal elections. *See, e.g.*, *Johnson v. Bradley*, 841 P.2d 990 (Cal. 1992) (holding that city charter authorizing partial public financing of campaigns for elective city office superseded state statute in light of art. 11, section 5(e) of California Constitution); *State v. Callahan*, 221 P. 718 (Okla. 1923) (holding that state law did not displace charter provisions for non-partisan municipal primary); *Ex parte Boalt*, 260 P. 1004 (Or. 1927) (stating that election of municipal judge was of purely local concern).

¶43 We are not persuaded by the out-of-state cases cited by the State. In *Jacobberger*, the Nebraska Supreme Court held that a statute mandating district-based elections displaced

21

Omaha's charter provisions for at-large elections, noting that "the primary concern of the legislation was to insure the fundamental right to vote and the right to proportionate representation." 320 N.W.2d at 907. No similar intent was identified by Arizona's Legislature in amending A.R.S. § 9-821.01; that statute, as noted, does not bar at-large elections as such; and at-large elections do not necessarily deny voting rights protected by Arizona's Constitution or federal law. In *Casuse*, the New Mexico Supreme Court, relying on its prior decisions interpreting New Mexico's constitution as allowing general legislation to limit a municipality's home-rule power, held that a state law preempted Gallup's charter provision for at-large council elections. 746 P.2d at 1104. This reasoning is contrary to *Strode* and other Arizona decisions.

¶44 The State finally observes that Tucson's method of electing council members has resulted in candidates winning in the general election who did not receive the most votes in the ward from which they were nominated. The State contends that if a council member represents a particular ward, the State has an interest in assuring the person has the support of a majority of the ward's voters. But Tucson council members, although nominated by ward, represent the entire city, just as do council members elected at large in other cities.

22

¶**45**       An at-large council election by its nature allows candidates to win who may not receive a majority of votes in particular areas of the city.  (District based elections, in contrast, allow council members to vote on matters affecting the entire city even though they are not elected, and might not be preferred, by a majority of the city's voters.)  The provisions in Arizona's Constitution regarding voting rights, however, do not require cities generally to adopt district-based elections. Instead, Article 13, Section 2 allows a charter city to determine "who shall be its governing officers and how they shall be selected."  *Strode*, 72 Ariz. at 368, 236 P.2d at 54.

¶**46**       Determining the method for electing city council members necessarily involves a weighing of competing policy concerns.  Our opinion neither involves policy choices nor endorses one method of election over another; instead it considers whether Arizona's Constitution entrusts those issues to the voters of charter cities or the state legislature.

¶**47**       Given Article 13, Section 2, the intent of Arizona's framers, and the history of municipal government in our state, we hold that electors in charter cities may determine under their charters whether to constitute their councils on an at-large or district basis and whether to conduct their elections on a partisan basis.  In so doing, they must of course comply with the Arizona Constitution and federal law.  But the local

autonomy preserved for charter cities by Arizona's Constitution allows Tucson voters to continue electing their council members pursuant to the city's 1929 charter notwithstanding A.R.S. § 9-821.01(B) and (C).

## CONCLUSION

¶48    We vacate the opinion of the court of appeals and remand the case to the superior court for entry of summary judgment in favor of the City of Tucson.


_____
                    W. Scott Bales, Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Andrew D. Hurwitz, Vice Chief Justice


_____
A. John Pelander, Justice


_____
Robert M. Brutinel, Justice