IN THE

# ARIZONA COURT OF APPEALS

DIVISION TWO

———————————————

CITY OF TUCSON, A MUNICIPAL CORPORATION
*Plaintiff /Appellee*,


*and*


CITY OF PHOENIX,
*Intervenor-Plaintiff/Appellee*,


*v.*


THE STATE OF ARIZONA AND KEN BENNETT, IN HIS OFFICIAL CAPACITY
AS SECRETARY OF STATE OF ARIZONA
*Defendants/Appellants*.


No. 2 CA-CV 2013-0146
Filed August 18, 2014

———————————————


Appeal from the Superior Court in Pima County
No. C20126272
The Honorable James E. Marner, Judge

**AFFIRMED**

———————————————

COUNSEL


Michael G. Rankin, Tucson City Attorney, Tucson
By Dennis P. McLaughlin, Principal Assistant City Attorney
*Counsel for Plaintiff/Appellee City of Tucson*


Daniel L. Brown, Acting Phoenix City Attorney, Phoenix
By Sandra Hunter, Assistant Chief Counsel
*Counsel for Intervenor-Plaintiff/Appellee City of Phoenix*

Thomas C. Horne, Arizona Attorney General
By Paula S. Bickett, Chief Counsel, Civil Appeals, Phoenix
Diana Day, Assistant Attorney General
*Counsel for Defendants/Appellants*

Juan Pablo Flores, Douglas City Attorney, Douglas
*Counsel for Amicus Curiae City of Douglas*

Judith R. Baumann, Tempe City Attorney, Tempe
By David Park, Assistant City Attorney
*Counsel for Amicus Curiae City of Tempe*

---

**OPINION**

Judge Miller authored the opinion of the Court, in which Judge Howard and Judge Vásquez concurred.

---

M I L L E R, Judge:

¶1        Section 16-204(E), A.R.S., was added in 2012 to require that most municipal candidate elections be held simultaneously with state and national candidate elections.  2012 Ariz. Sess. Laws, ch. 353, § 1.  As originally enacted in 1996, § 16-204 limited these elections to only four specified days each year, which the Legislature declared was for the "purpose[] of increasing voter participation and for decreasing the costs to taxpayers."  1996 Ariz. Sess. Laws, ch. 271, § 16.  By mandating municipal candidate elections be held on even-numbered years, concurrent with general elections, the amended statute banned off-cycle municipal candidate elections.[1]

---

[1]An election held on a date different from state and national elections is referred to as an off-cycle election.  *See, e.g., United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 420 (S.D.N.Y. 2010) ("Village elections for Mayor and Trustees are held 'off cycle'—that is, they are not conducted in November alongside other county, state, and national elections, but instead are held in the spring,

Relying on the declaration of purpose for the original statute, the state contends the amendment is a matter of statewide concern that preempts city charter provisions to the contrary. § 16-204(A), (E). The cities of Tucson and Phoenix sought declaratory and injunctive relief, arguing the Arizona Constitution did not grant the legislature authority to preempt their charters that mandate candidate elections be held on odd-numbered years. The cities' position is supported in amicus briefs filed by the cities of Douglas and Tempe.

**¶2**  This appeal requires us to determine whether the authority of charter cities to structure how their governing officers are elected includes the power to schedule their election cycles wholly separate from state-wide elections. We also consider, consistent with our case law, whether the selection of an off-cycle election is a matter affecting "'the method and manner of conducting elections,'" or is limited to an "administrative aspect[] of elections." *City of Tucson v. State*, 229 Ariz. 172, ¶¶ 32, 35, 273 P.3d 624, 629-30 (2012) (*Tucson II*), *quoting Strode v. Sullivan*, 72 Ariz. 360, 368, 236 P.2d 48, 54 (1951).

**¶3**  For the reasons that follow, we conclude that state-mandated election alignment, when it conflicts with a city's charter, improperly intrudes on the constitutional authority of charter cities. We therefore affirm the trial court's judgment that § 16-204 does not preempt city charters that require odd-numbered year election dates.

## Factual and Procedural Background

**¶4**  The cities of Tucson and Phoenix are chartered under the Arizona Constitution. Ariz. Const. art. XIII, § 2; Tucson City Charter ch. I; Phoenix City Charter, Preamble; *see also Tucson II*, 229 Ariz. 172, n.1, 273 P.3d at 626 n.1. Their charters require candidate elections to be held on odd-numbered years, staggered from the even-numbered-year federal, state, and county elections. Tucson

---

usually on the third Tuesday in March."). An odd-year election is necessarily an off-cycle election. *See* Ariz. Const. art. VII, § 11 (requiring biennial general elections on even-numbered years).

City Charter ch. XVI, §§ 2-4; Phoenix City Charter ch. III, § 6.  In 2012, the Arizona Legislature amended § 16-204[2] to require charter

_____

[2]Section 16-204 now states in relevant part:

E.  Beginning with elections held in 2014 and later and notwithstanding any other law or any charter or ordinance to the contrary, a candidate election held for or on behalf of any political subdivision of this state other than a special election to fill a vacancy or a recall election may only be held on the following dates and only in even-numbered years:

1.  The tenth Tuesday before the first Tuesday after the first Monday in November.  If the political subdivision holds a primary or first election and a general or runoff election is either required or optional for that political subdivision, the first election shall be held on this date, without regard to whether the political subdivision designates the election a primary election, a first election, a preliminary election or any other descriptive term.

2.  The first Tuesday after the first Monday in November.  If the political subdivision holds a general election or a runoff election, the second election held shall be held on this date.  If the political subdivision holds only a single election and no preliminary or primary or other election is ever held for the purpose of reducing the number of candidates, or receiving a partisan nomination or designation or for any other purpose for that political subdivision, the single election shall be held on this date.

4

cities to hold their first (primary or general) and second (general or runoff) candidate elections on the same two days that the state holds its primary and general elections for county, state, and federal offices. 2012 Ariz. Sess. Laws, ch. 353, § 1; *see also* A.R.S. §§ 16-201, 16-211.

¶5 The City of Tucson sought declaratory and injunctive relief against the state and Ken Bennett, in his official capacity as secretary of state. Appellee City of Phoenix moved to intervene, which motion the trial court granted. The parties filed cross-motions for summary judgment, asserting that no genuine issue of material fact existed and they were entitled to judgment as a matter of law. The court denied the motions, finding that the parties had presented conflicting factual claims and that an evidentiary hearing was "necessary to allow the Court to determine as a matter of fact whether the state's interests are paramount thereby mandating adoption of the election schedule described in the recently amended version of A.R.S. § 16-204 by Tucson and Phoenix," citing *City of Tucson v. State*, 191 Ariz. 436, 957 P.2d 341 (App. 1997) (*Tucson I*). After a two-day evidentiary hearing,[3] the court granted relief in favor of the cities, and this appeal followed. We have jurisdiction pursuant to A.R.S. § 12-2101(A)(1).

## Discussion

¶6 Whether § 16-204(E) improperly preempts the constitutional authority of a charter city to direct its own affairs is a question of law we review de novo. *See Tucson I*, 191 Ariz. at 437, 957 P.2d at 342; *see also Tucson II*, 229 Ariz. 172, ¶ 34, 273 P.3d at 630. Under the Arizona Constitution, a city with a population of more than 3,500 people is entitled to establish a charter for its government. Ariz. Const. art. XIII, § 2; *see also* John D. Leshy, *The Arizona State Constitution* 333 (2d ed. 2013). Known as the home-rule provision, the purpose of article XIII, § 2 "'was to render the cities adopting

---

[3]Our resolution of the issue on appeal is necessarily an ad hoc determination that does not turn on disputed questions of adjudicative fact. *See Tucson II*, 229 Ariz. 172, ¶ 20, 273 P.3d at 628. Thus, we do not review the trial court's findings of fact.

such charter provisions as nearly independent of state legislation as was possible.'" *Tucson II*, 229 Ariz. 172, ¶ 9, 273 P.3d at 626, *quoting City of Tucson v. Walker*, 60 Ariz. 232, 239, 135 P.2d 223, 226 (1943); *see also* Leshy, *supra*, at 333-34. Our supreme court has held that a charter city is granted autonomy over matters of local interest. *See, e.g.*, *Tucson II*, 229 Ariz. 172, ¶¶ 45-47, 273 P.3d at 631-32; *Strode*, 72 Ariz. at 364-65, 236 P.2d at 51. If a state law conflicts with the provisions of a city charter and the relevant interest is local, the city's charter supersedes the statute. *See Tucson II*, 229 Ariz. 172, ¶ 20, 273 P.3d at 628; *Strode*, 72 Ariz. at 364-65, 236 P.2d at 51. Because § 16-204(E) conflicts with the cities' charters, we must determine whether the interests affected are local or statewide.

¶7        Determining whether the subject matter at issue is of statewide or local interest "can be problematic in application." *Tucson II*, 229 Ariz. 172, ¶ 20, 273 P.3d at 628. "The concepts of 'local' versus 'statewide' interest do not have self-evident definitions." *Id.* Our supreme court has not provided an explicit framework through which we might analyze the question before us; rather, "distinguishing between matters that are properly subject to local versus state control often involves case-specific line drawing." *Id.* This is not a problem unique to Arizona. In their expansive review of how courts address this issue, professors Baker and Rodriguez observed:

> Where the state constitution grants localities sovereign power in the area of local affairs, the task falls to the court to discern just what is or is not a local affair. The nature of the project is necessarily ad hoc: The courts are asked to evaluate specific exercises of municipal power against the background of language, typically "local affairs" or "municipal affairs," that is notoriously ambiguous.

Lynn A. Baker & Daniel B. Rodriguez, *Constitutional Home Rule and Judicial Scrutiny*, 86 Denv. U. L. Rev. 1337, 1344 (2009). In the context of election-related matters, Arizona cases particularly focus on whether a conflicting statute affects the autonomy of a charter city,

for which the manner and method of conducting elections is a critical component.

Charter City Autonomy

¶8        Our supreme court has been "absolutely clear that charter city governments enjoy autonomy with respect to structuring their own governments." *Tucson II*, 229 Ariz. 172, ¶ 21, 273 P.3d at 628.  More than sixty years ago, in *Strode*, our supreme court considered a charter city's autonomy involving the non-partisan election system adopted by the City of Phoenix.  *See Strode*, 72 Ariz. at 361-62, 236 P.2d at 49-50; Phoenix City Charter ch. XII, § 9.  At the time, state statutes permitted candidates for state, county, and city offices to be nominated as a member of a political party.  *See Strode*, 72 Ariz. at 361-64, 236 P.2d at 50-51; *see also Tucson II*, 229 Ariz. 172, ¶ 18, 273 P.3d at 627.  The court concluded that these statutes did not displace the Phoenix charter, which provided that "'nothing on the ballot shall be indicative of the source of the candidacy or the support of any candidate.'"  *Strode*, 72 Ariz. at 363, 368, 236 P.2d at 50, 54, *quoting* Phoenix City Charter ch. XII, § 9; *see also Tucson II*, 229 Ariz. 172, ¶ 18, 273 P.3d at 627.

¶9        The supreme court in *Strode* emphasized the importance of protecting a charter city's authority to structure its own government:

> The framers of the Constitution, in authorizing a qualified city to frame a charter for its own government, certainly contemplated the need for officers and the necessity of a procedure for their selection. These are essentials which are confronted at the very inception of any undertaking looking toward the preparation of a governmental structure. *We can conceive of no essentials more inherently of local interest or concern to the electors of a city than who shall be its governing officers and how they shall be selected.*

72 Ariz. at 368, 236 P.2d at 54 (emphasis added). Therefore, if an off-cycle election affects the method and manner of selecting its governing officers, the constitution protects the autonomy of the charter city.

¶10 The state contends other language in *Strode* limits the constitutional authority of city charters to laws that are "purely municipal." It argues, not without persuasive force, that "purely" is a term of exclusion. Stated simply, the state would limit *Strode*'s holding to statutes without any potential statewide interest. We disagree. First, the seemingly exclusionary language in *Strode* derives from multiple citations to Oklahoma cases that employ the terms as dicta. *See*, *e.g.*, *City of Wewoka v. Rodman*, 46 P.2d 334, 335 (Okla. 1935) (charter city control over fire department is "purely" and "solely" matter of local concern); *Lackey v. State*, 116 P. 913, 919 (Okla. 1911) (date of elections is a "mere municipal matter").[4]

¶11 Second, in *Tucson II* our supreme court reaffirmed the rationale employed by *Strode* and reached the same result while acknowledging potential statewide interests at play. The court first observed that "[m]any municipal issues will be of both local and state concern." *Tucson II*, 229 Ariz. 172, ¶ 20, 273 P.3d at 628. If, as the state contends, the mere existence of a potential state interest is sufficient to negate a finding of a "purely" local interest, then the court's analysis would have ended and it would have concluded the statute applies to Tucson's elections. Instead, the court examined each of the potential statewide interests to determine if any trumped Tucson's charter. For example, the state argued "the federal Voting Rights Act ('VRA'), 42 U.S.C. § 1973 (2006), creates a statewide interest in barring Tucson's use of at-large council elections." *Id.* ¶ 36. Although the court acknowledged that the city must comply

---

[4]The holding in *Lackey* is particularly significant because if it were unequivocally adopted in Arizona, the decision would resolve the case adverse to the state without further discussion. *See* 116 P. at 918-19. As we discuss later in this decision, however, the holding in *Tucson I* and the adoption of some of its reasoning in *Tucson II* militate against the bright-line rule of *Lackey* notwithstanding its endorsement in *Strode*.

with applicable federal law, and the state's compliance with the VRA could be affected if "its political subdivisions . . . engaged in any discriminatory voting practice," there was no evidence of VRA violations by the city. *Id.* ¶¶ 37-38. It held that "[c]oncerns to prevent possible violations of the VRA," which are of statewide interest, "do not support . . . trumping Tucson's charter." *Id.* ¶ 39. We conclude, therefore, the possibility of a statewide interest in a statute does not bar the conclusion that the statute impermissibly reaches an area of "purely" or "solely" local interest. *See id.*

<u>The Method and Manner of Conducting Elections Is An Expression of Charter City Autonomy</u>

**¶12**        The state acknowledges that the Legislature cannot regulate the "method and manner" of conducting municipal elections. *See Tucson II*, 229 Ariz. 172, ¶ 22, 273 P.3d at 628. It contends, however, our supreme court determined the choice of an election date to be a permissible legislative function that only involves the "administrative aspects of elections." *See id.* ¶ 35. We agree with the state that dicta from *Tucson II* arguably places election dates outside of local autonomy and interest, but the case from which the dicta is derived, *Tucson I*, cannot be stretched so far.

**¶13**        As originally enacted, § 16-204 merely restricted elections held by political subdivisions to four specified dates during the year. *Tucson I*, 191 Ariz. at 437, 957 P.2d at 342. The practical impact on the City of Tucson was minor:  a one-week change in the date of its primary election. *Id.* at 439, 957 P.2d at 344. Section 16-204(E), on the other hand, would require major changes to city charters and election procedures, including altering the terms of office for some officials. The state responds that even if these changes are significant, they are "one-time" adjustments to achieve election alignment. Assuming for the purpose of argument that § 16-204(E) requires minor, one-time adjustments, we next address whether an off-cycle election is an integral component of the method and manner of conducting elections.

**¶14**        The cities argue that election alignment affects numerous election issues. An off-cycle election allows a city to obtain the full focus of the electorate and to insulate its electoral

process from the influence of partisan issues that are inevitably interwoven with federal, state, and county elections. Additionally, municipal candidates may have a more difficult time competing with state and national candidates for resources if the elections are aligned. Even if the candidates receive sufficient resources, it may be more difficult or expensive to use those resources for election advertising during general elections.

¶15 The decision to hold an off-cycle election may also affect voter participation. The cities and state seemingly agree on this point, although they disagree whether the ultimate impact is positive or negative because of additional factors, such as voter fatigue and ballot roll-off.[5] These differing conclusions illustrate valid policy disagreements and, potentially, qualitatively different results in election outcomes. As law professors Barry and Gersen observed:

> [T]he timing of local government elections has significant implications for local democratic process. Electoral timing significantly influences voter turnout and generates identifiable differences in substantive policy outcomes.

Christopher R. Berry & Jacob E. Gersen, *The Timing of Elections*, 77 U. Chi. L. Rev. 37, 55 (2010).

---

[5]Voter fatigue refers to reluctance of voters to participate in multiple elections held on different dates. *Cf.* Zoltan L. Hajnal et al., *Municipal Elections in California: Turnout, Timing, and Competition* vii-viii (2012) (voter turnout affected by timing of local election, including whether local election held concurrent with statewide election). Ballot roll-off describes the phenomenon where fewer votes are cast as the ballot extends in length. *Cf. Green Party of Tennessee v. Hargett*, 953 F. Supp. 2d 816, 833 (M.D. Tenn. 2013) (increase in physical dimension of ballot, whether size of paper or number of pages, may increase likelihood that voters fail to complete their ballots).

**¶16** Our supreme court concluded that when there are "competing policy concerns" in the manner of the election, "Arizona's Constitution entrusts those issues to the voters of charter cities [if the statute conflicts with the charter]." *Tucson II*, 229 Ariz. 172, ¶ 46, 273 P.3d at 632.[6] The "administrative aspects" of elections do not encompass substantive policy matters. *Id.* ¶ 35. For instance, our supreme court explained that whether or not a charter city conducts a partisan election involves competing policy concerns that Arizona's Constitution entrusts to the voters of a charter city. *Id.* ¶¶ 46-47; *see also Strode*, 72 Ariz. at 368-69, 236 P.2d at 54. Similarly, the home rule charter provision of article XIII, § 2 entrusts charter city voters to determine whether they want their municipal elections shaped by state, county, or federal partisan issues.

**¶17** We next examine whether the state identifies actual statewide interests. The state relies upon the 1996 legislative declaration[7] that the statute was for "the purposes of increasing voter participation and for decreasing the costs to the taxpayers." A.R.S. § 16-204(A). Initially, we note that this portion of the declaration was not modified or updated in 2012. 2012 Ariz. Sess.

---

[6]*Tucson II* is also notable for the absence of any reference to the balancing test outlined in *Tucson I*. *See Tucson I*, 191 Ariz. at 439, 957 P.2d at 344. Instead, *Tucson II* instructs that the Arizona Constitution places with the voters the responsibility to choose between competing policy concerns. *Tucson II*, 229 Ariz. 172, ¶ 46, 273 P.3d at 632. From that perspective, we agree with the state's contention that the trial court erred in applying a balancing test.

[7] To the extent the state argues we must defer to the Legislature's declaration that § 16-204 concerns a matter of statewide interest, we disagree. We must respect and consider legislative findings, but "whether state law prevails over conflicting charter provisions under Article 13, Section 2 is a question of constitutional interpretation," within the exclusive province of the courts. *Tucson II*, 229 Ariz. 172, ¶ 34, 273 P.3d at 630; *see also Walker*, 60 Ariz. at 238-39, 135 P.2d at 226-27; *cf. Forty-Seventh Legislature of State v. Napolitano*, 213 Ariz. 482, ¶ 8, 143 P.3d 1023, 1026 (2006) (noting courts ultimately responsible for interpreting constitution).

Laws, ch. 353, § 1. This begs the question: if mandatory alignment of off-cycle charter city elections increases voter participation and decreases taxpayer costs, wouldn't the state have had the same interest when the original statute was enacted sixteen years earlier? If so, presumably the Legislature would have aligned off-year elections in 1996. That it did not take that action in 1996 causes doubt as to whether its declaration even applies to the 2012 amendment. While it is possible that conditions changed in the interim period necessitating broader alignment, the state advances no facts or legislative findings to support such a conclusion.

¶18　　　The state also relies upon the comments of legislators and the bill's supporters that the amendment would decrease costs and increase voter turnout. *See Hearing on H.B. 2826 Before the H. Comm. on Judiciary*, 50th Leg., 2d Reg. sess. (Feb. 16, 2012); *Hearing on H.B. 2826 Before the S. Comm. on Judiciary*, 50th Leg., 2d Reg. sess. (March 12, 2012). Notably missing from the comments, however, was factual support for how the state's own interests would be affected. *See*, *e.g.*, *Hearing on H.B. 2826 Before the H. Comm. of the Whole*, 50th Leg., 2d Reg. sess. (March 1, 2012) (statement of Rep. John Kavanagh, relating positive experience of Scottsdale in aligning its election, but omitting any benefit for non-city voters).

¶19　　　Similarly, in its legal argument the state does not posit that interests outside of the charter cities are affected. For instance, assuming that alignment decreases "costs to taxpayers," are those city or state taxpayers? If the latter, the state provides no support for its contention. If only city costs are implicated, then the Arizona Constitution delegates to the city's voters to determine whether its costs actually would decrease and, if so, whether the decrease is worth the trade-off in loss of off-cycle election benefits. *See Tucson II*, 229 Ariz. 172, ¶ 46, 273 P.3d at 632. The same questions and conclusions apply to the state's contention regarding voter participation. We conclude the state has not shown § 16-204(E) implicates an existing, statewide interest that is not independent of the interests of the charter cities.

¶20　　　Finally, our own research discloses one out-of-state case involving off-cycle elections by a home-rule jurisdiction. In *State ex rel. Carroll v. King County*, 474 P.2d 877, 878 (Wash. 1970), the

Washington Supreme Court held that a county adopting a home rule charter could elect its officers in odd-numbered years despite an earlier constitutional provision establishing county elections in even-numbered years. Although the court was required to resolve arguably conflicting state constitutional provisions, it relied on principles similar to those expressed in *Strode* and *Tucson II*:

> The people of this state, in adopting [a home rule enabling mechanism], manifested an intent that they should have the right to conduct their purely local affairs without supervision by the state, so long as they abided by the provisions of the constitution and did not run counter to considerations of public policy of broad concern, expressed in general laws. The respondent has suggested no sound reason why the state should have an interest in the dates of elections which concern only the residents of a county.

*Id.* at 880. The reasoning applied in Oklahoma in 1911 or Washington in 1970 applies equally to Arizona in 2014.

## Disposition

¶21 In light of the foregoing, we affirm the trial court's grant of a permanent injunction enjoining the State of Arizona from requiring the City of Tucson and the City of Phoenix to comply with the candidate election scheduling requirements of § 16-204, as amended.