IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STATE OF ARIZONA, EX REL. MARK BRNOVICH, ATTORNEY GENERAL,
*Petitioner,*

*v.*

CITY OF TUCSON, ARIZONA,
*Respondent.*

No. CV-20-0244-SA
**Filed April 14, 2021**

## SPECIAL ACTION
## JURISDICTION ACCEPTED; RELIEF DENIED

COUNSEL:

Mark Brnovich, Arizona Attorney General, Joseph A. Kanefield, Chief Deputy and Chief of Staff, Brunn W. Roysden III (argued), Solicitor General, Michael S. Catlett, Linley Wilson, Jennifer Wright, Assistant Attorneys General, Phoenix, Attorneys for State of Arizona

Jean-Jacques Cabou (argued), Alexis E. Danneman, Matthew R. Koerner, Perkins Coie LLP, Phoenix; Michael G. Rankin, City Attorney, Dennis P. McLaughlin, Roi I. Lusk, Jennifer Stash, Principal Assistant City Attorneys, Office of the Tucson City Attorney, Tucson, Attorneys for City of Tucson

Jon M. Paladini, Prescott City Attorney, RoseMarie R. Horvath, City of Prescott Legal Department, Prescott, Attorneys for Amicus Curiae City of Prescott

Robert B. Washburn, Scottsdale, Attorney for Amicus Curiae League of Arizona Cities and Towns

Judith R. Baumann, Tempe City Attorney, Sarah R. Anchors, Elizabeth Higgins, Assistant City Attorneys, City of Tempe, Tempe, Attorneys for Amicus Curiae City of Tempe

Cris A. Meyer, Phoenix City Attorney, Deryck R. Lavelle, Assistant City Attorney, Office of the City Attorney, Phoenix, Attorneys for Amicus Curiae City of Phoenix

---

VICE CHIEF JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BRUTINEL, and JUSTICES LOPEZ, BEENE, and MONTGOMERY joined.[*]   JUSTICE BOLICK dissented.

---

VICE CHIEF JUSTICE TIMMER, opinion of the Court:

¶1        Arizona Revised Statutes § 16-204.01 requires political subdivisions to consolidate local elections with state and national elections when voter turnout for the former significantly decreases.   Our constitution's "home rule charter" provision, article 13, § 2, gives charter cities autonomy over matters of purely municipal concern.   We are asked to decide whether the home rule charter provision precludes application of § 16-204.01 to a city whose charter requires electing local officials on non-statewide election dates.   Whether to align municipal elections with state and national elections or hold them in different years is purely a matter of municipal interest and not a statewide concern.   Consequently, we hold that § 16-204.01 cannot apply to require a city to consolidate local elections with state and national elections if its charter provides otherwise.

---

[*] Although Justice Andrew W. Gould (Ret.) participated in the oral argument in this case, he retired before issuance of this opinion and did not take part in its drafting.

**BACKGROUND**

¶2          The legislature has sought in recent years to align local, state, and national election dates.   Beginning with the 2014 elections, the legislature required nearly all political subdivisions to hold most candidate elections in even-numbered years on dates selected for state and national elections.[1]   *See* A.R.S. § 16-204(E); *see also* A.R.S. §§ 16-211 through -213 (setting dates for state and national candidate elections); Ariz. Const. art. 7, § 11 (requiring biennial general elections be held in even-numbered years). In doing so, the legislature preempted all laws, charters, and ordinances requiring different election dates.   *See* § 16-204(E).   After two charter cities challenged this legislation, the court of appeals held that "state-mandated election alignment, when it conflicts with a city's charter, improperly intrudes on the constitutional authority of charter cities."   *City of Tucson v. State* (*Tucson III*), 235 Ariz. 434, 435 ¶ 3 (App. 2014).   In relevant part, the court found "no facts or legislative findings" showing that aligning local, state, and national candidate elections affects statewide interests, which would have rendered § 16-204(E) permissible under the home rule charter provision.   *Id.* at 439 ¶ 17.

¶3          In 2018, the legislature responded to *Tucson III* by enacting A.R.S. §§ 16-204.01 and -204.02.   *See* § 16-204.01(A).   Section 16-204.01 requires a political subdivision to "hold its elections on a statewide election date" ("on cycle") if voter turnout for its most recent local election held on a non-statewide election date ("off cycle") decreased by twenty-five percent or more from the political subdivision's voter turnout for the most recent gubernatorial election.   § 16-204.01(B) and (D)(2).   Section 16-204.01 does not authorize political subdivisions to return to off-cycle elections once moved to on-cycle elections.   If off-cycle elections are consolidated with on-cycle election dates, incumbent officials' terms in office are lengthened to align accordingly.   *See* § 16-204.02.

¶4          The legislature found that consolidating election dates in the above-described circumstances would increase voter participation in local elections, a matter of statewide concern.   § 16-204.01(A).   Thus, as it did in § 16-204, the legislature preempted all contrary local laws, ordinances, and charter provisions.   *See* §§ 16-204.01(A) and -204.02(A).

---

[1] Special elections to fill vacancies and recall elections can be held on one of four dates in any year.   *See* A.R.S. § 16-204(F).

**¶5**        The City of Tucson is an incorporated city with a charter. Since 1960, its charter has required off-cycle elections for electing city officials and for repealing or amending previously adopted city initiative measures.   Tucson City Charter, ch. 16, §§ 3, 4; ch. 19, § 9.   The charter empowers the mayor and city council to select election dates.   *Id.*, ch. 4, § 1(20); ch. 16, § 6.

**¶6**        After enactment of §§ 16-204.01 and -204.02, the City placed a referendum measure on the November 2018 ballot seeking to amend its charter to require on-cycle elections.   The measure failed.

**¶7**        The City experienced a significant decline in voter turnout between the 2018 gubernatorial election and the 2019 city election, thereby triggering § 16-204.01's directive for conducting on-cycle elections. Regardless, the mayor and city council enacted Ordinance No. 11731 ("Ordinance") in 2020, setting off-cycle primary and general election dates in 2021 to select three city council members.

**¶8**        An Arizona legislator asked the Attorney General to investigate whether the Ordinance violates § 16-204.01.   The request triggered A.R.S. § 41-194.01, which required the Attorney General to investigate and report whether the Ordinance violates, may violate, or does not violate § 16-204.01.   *See* § 41-194.01(A)–(B).

**¶9**        The Attorney General found that the Ordinance may violate § 16-204.01.   Pursuant to § 41-194.01(B)(2), he therefore filed this special action asking us to resolve the issue.   We have jurisdiction pursuant to article 6, section 5(6) of the Arizona Constitution and § 41-194.01(B)(2).

## DISCUSSION

### I.        General principles

**¶10**        Arizona's constitutional framers adopted a home rule charter provision during the 1910 convention.   Ariz. Const. art. 13, § 2.   Including the provision in our constitution coincided with an urban reform movement seeking to discontinue treating cities as mere "creatures, agents, or subdivisions" of the state by providing them lawmaking authority and

4

freedom from state legislative interference in municipal affairs.[2]   David J. Barron, *Reclaiming Home Rule*, 116 Harv. L. Rev. 2255, 2278 & n.68 (2003); *see also* Toni McClory, *Understanding Arizona's Constitution* 178 (2d ed. 2010) ("Arizona's Progressive founders valued local autonomy, so they put constitutional limits on the legislature's ability to interfere with cities and towns.   For example, the legislature is expressly prohibited from enacting 'local or special' laws that treat communities individually.   Even more importantly, the Progressives encouraged municipal home rule."); *Strode v. Sullivan*, 72 Ariz. 360, 367 (1951) (explaining that the purpose of home rule "is to emancipate the municipal governments of cities . . . from the control formerly exercised over them by the Legislature" (quoting *State ex rel. Short v. Callahan*, 221 P. 718, 719 (Okla. 1923))); *State ex rel. Brnovich v. City of Tucson* (*Tucson IV*), 242 Ariz. 588, 598 ¶ 40 (2017) (phrasing the purpose as "render[ing] the cities adopting such charter provisions as nearly independent of state legislation as was possible" (quoting *City of Tucson v. Walker*, 60 Ariz. 232, 239 (1943))).

¶11         Arizona's home rule charter provision authorizes any city with a population greater than 3500 people to "frame a charter for its own government."   Ariz. Const. art. 13, § 2.   Once ratified by the city's voters and approved by the governor, the charter becomes the "organic law of such city," effectively, a local constitution.   *See id.*; *City of Tucson v. State* (*Tucson II*), 229 Ariz. 172, 174 ¶ 10 (2012); *see also Paddock v. Brisbois*, 35 Ariz. 214, 220 (1929) (noting that unlike a state constitution, which limits state government's power, a city charter "is a grant of power").   Whatever powers a city exercises under its charter, however, must be "consistent with, and subject to, the Constitution and laws of the state." *See* Ariz. Const. art. 13, § 2; *accord* A.R.S. § 9-284(B); *see also Strode*, 72 Ariz. at 364 (stating that a charter city does not possess "carte blanche authority or plenary power to adopt any legislation that it might desire"); *Tucson IV*, 242 Ariz. at 602 ¶ 55 (observing that our prior cases have consistently recognized that the "consistent with, and subject to" clause operates as a "significant constitutional restraint on charter cities' powers").

---

[2] Missouri was the first state to adopt a home rule charter provision in 1875. Alice M. Holden, *Home Rule Legislation during the Years 1913–1914*, 9 Am. Pol. Sci. Rev. 322, 322 n.1 (1915), https://www.jstor.org/stable/1944628 (last visited Mar. 1, 2021).   Seven states followed suit before Arizona and three other states adopted home rule charter provisions in 1912.   *Id*.

¶12        Although the home rule charter provision addresses conflicts between a charter and state laws existing at the time the charter is approved, it does not expressly address conflicts arising *after* the charter is approved.   *See* Ariz. Const. art. 13, § 2 (requiring the governor to approve a voter-ratified charter and any subsequently ratified amendments unless they "conflict with [the] Constitution or with the laws of the state").   From statehood onward, however, the home rule charter provision has been continuously viewed as providing local autonomy to exercise charter-granted authority over purely municipal concerns while preserving final state legislative authority over matters of joint municipal and statewide concern.   *See, e.g.*, 1912 Ariz. Sess. Laws ch. 11, § 4 (1st Spec. Sess.) (implementing the home rule charter provision and providing, in relevant part, that upon a charter's approval, its provisions prevail over conflicting state laws "relating to cities," if the charter does not conflict with laws involving initiatives and referenda "and other general laws of the State not relative to such cities"); § 9-284 (repeating the substance of the 1912 Act's treatment of conflicts between a charter and state law); *Clayton v. State*, 38 Ariz. 466, 468 (1931) (on motion for rehearing) (stating "[if] the subject [over which a charter city exercises authority] is of state-wide concern, and the Legislature has appropriated the field and declared the rule, its declaration is binding throughout the state"); *Walker*, 60 Ariz. at 239 ("[W]here the legislative act deals with a strictly local municipal concern, it can have no application to a city which has adopted a home rule charter."); *Mayor & Common Council of City of Prescott v. Randall*, 67 Ariz. 369, 371 (1948) (collecting cases establishing "that a charter city is sovereign in all of its 'municipal affairs' where the power . . . to be exercised has been specifically or by implication granted in its charter"); *Tucson II*, 229 Ariz. at 174 ¶ 10 ("[A] home rule city deriving its powers from the Constitution is independent of the state Legislature as to all subjects of strictly local municipal concern." (quoting *City of Tucson v. Tucson Sunshine Climate Club*, 64 Ariz. 1, 8–9 (1945))).

¶13        Our dissenting colleague, without either party's urging and as he did in *Tucson IV*, argues that this Court has consistently misinterpreted the home rule charter provision by engrafting onto it the above-described statutory and common law distinctions between treatment of purely municipal and statewide concerns.   *See infra* ¶¶ 56–59; *Tucson IV*, 242 Ariz. at 606–07 ¶¶ 76–78, 80 (Bolick, J., concurring in part and in the result).   He primarily faults this Court's decision in *Strode* as rewriting the constitution by authorizing a charter provision to prevail over state law on purely municipal concerns.   *See infra* ¶ 59; *cf. Tucson IV*, 242 Ariz. at 599

¶ 43 (noting that this Court, in fact, had recognized the purely municipal/statewide distinction "well before *Strode*"). He claims the home rule charter provision clearly provides "a bright-line rule: a city's charter is subject to the laws of the state. If the charter and a state statute collide, the former must yield." *See infra* ¶ 51. For the reasons explained in *Tucson IV* and hereafter, we again reject the dissent's position. 242 Ariz. at 599–600 ¶¶ 43–45.

**¶14** *Strode*'s interpretation of the home rule charter provision was not untethered from its language, as the dissent suggests. *See infra* ¶ 59; *Tucson IV*, 242 Ariz. at 606 ¶¶ 76–77. In interpreting the provision's requirement that a charter be "consistent with, and subject to, the constitution and the laws of the state," the Court concluded that "laws of the state" referred to the state's general affairs rather than laws addressing purely municipal affairs, thereby tying the provision's language to the purely municipal/statewide dichotomy the dissent eschews. *See Strode*, 72 Ariz. at 364.

**¶15** Notably, the *Strode* Court adopted the Oklahoma Supreme Court's interpretation of identical language in the Oklahoma Constitution's home rule charter provision. *Id.* In *City of Wewoka v. Rodman*, 46 P.2d 334, 336 (Okla. 1935), the court rejected an assertion that "'consistent with and subject to the Constitution and laws of the state' rendered invalid every provision of the charter in conflict with any statute of the state, whether pertaining to the general affairs of the state or to matters purely municipal." *Strode*, 72 Ariz. at 364. Instead, it interpreted the provision as meaning that a charter provision is "subject to any provision of the state law[] that goes beyond purely municipal affairs." *Id.* (quoting *Rodman*, 46 P.2d at 336). Thus, rather than "rewriting" the home rule charter provision, *Strode* interpreted its language as meaning that only state laws of statewide concern prevail over conflicting charter provisions, and that upon approval, "the provisions of the charter supersede all laws of the state in conflict with such charter provisions insofar as such laws relate to purely municipal affairs." *See id.* at 364–65.

**¶16** *Strode*'s interpretation of the home rule charter provision is correct even under closer scrutiny. The provision uses the term "laws of the state" twice, authorizing a qualified city to frame a charter "consistent with, and subject to . . . the laws of the state," the language at issue here, and requiring the governor to approve a voter-ratified charter unless it conflicts with the "laws of the state." Ariz. Const. art. 13, § 2. Nothing in

the provision indicates that "laws of the state" has a different meaning when used in addressing gubernatorial approval, so we give it a single meaning throughout the provision. *See Adams v. Comm'n on App. Ct. Appointments*, 227 Ariz. 128, 135 ¶ 34 (2011) (noting that constitutional language must be interpreted in context).

¶17    *Strode*'s interpretation of "laws of the state" is the only one that gives effect to the home rule charter provision. *See State v. Soto-Fong*, 250 Ariz. 1, 11 ¶ 42 (2020) ("Our primary purpose when interpreting the Arizona Constitution is to 'effectuate the intent of those who framed the provision.'" (quoting *Jett v. City of Tucson*, 180 Ariz. 115, 119 (1994)). If "laws of the state" included matters of purely municipal concern, as the dissent asserts, the governor could never approve charters, or any later amendments, that structured their governments in a manner contrary to state laws directing the structure for non-charter cities. *See* Ariz. Const. art. 13, § 2; *cf.* A.R.S. § 9-231(B) (imposing membership limits for city councils). And, of course, the legislature could trump a conflicting charter provision or charter-authorized ordinance on a matter of purely municipal concern by enacting a contrary law. In short, the state—not the city— would effectively "frame a charter" for that city's government. *See* Ariz. Const. art. 13, § 2. Interpreting "laws of the state" to mean laws of statewide concern preserves a charter city's local autonomy, as the framers intended. *See Jett*, 180 Ariz. at 119 (stating that to discern the meaning of unclear language in the constitution, courts may consider "the history behind the provision, the purpose sought to be accomplished, and the evil sought to be remedied").

¶18    As we pondered in *Tucson IV*, what's left of the home rule charter provision under the dissent's view? 242 Ariz. at 599 ¶ 44. The answer: not much.

## II.    Application here

¶19    The issue here is whether the subject matter of the City's charter and Ordinance—conducting off-cycle municipal elections—is a matter of purely municipal concern or is also one of statewide interest. *See Tucson II*, 229 Ariz. at 176 ¶ 20; *Tucson IV*, 242 Ariz. at 601 ¶ 52. If the issue is of purely local concern, § 16-204.01 cannot preempt the City's charter provision requiring off-cycle municipal elections and the Ordinance scheduling the 2021 elections is valid. If the issue is of statewide interest, § 16-204.01 applies to require the City to hold on-cycle municipal elections

and the Ordinance is invalid. Resolving this issue is a question of constitutional interpretation, which we decide de novo as an issue of law. *See State ex rel. Brnovich v. City of Phoenix*, 249 Ariz. 239, 243 ¶ 17 (2020).

¶20 Identifying "purely municipal" versus "statewide" interests is often challenging, as the variety of case-specific facts makes setting precise definitions difficult. *See Tucson II*, 229 Ariz. at 176 ¶ 20; *Tucson IV*, 242 Ariz. at 599 ¶ 42. But, generally speaking, matters of purely municipal concern are few in number. *See Walker*, 60 Ariz. at 238 (explaining that "the Constitution does not confer on the city the right [in framing its charter] to assume all the powers that the state may exercise within the city limits, but only powers incident to its municipality," which are those "necessary or incident to the government of the municipality" (quoting *State ex rel. Garner v. Mo. & K. Tel. Co.*, 88 S.W. 41, 43 (Mo. 1905))). Thus far, we have upheld charter-authorized municipal ordinances that conflict with state laws in two subject areas. *See Tucson IV*, 242 Ariz. at 602 ¶ 56. The first is the city's manner and method of disposing of its real estate, which is not implicated here. *See id.* ¶ 57. The second is the "method and manner of conducting elections in the city," which potentially applies here. *See Strode*, 72 Ariz. at 368. Our prior "home rule" cases involving elections therefore warrant scrutiny.

¶21 In *Strode*, this Court resolved a conflict between Phoenix's charter, which prohibited listing a municipal candidate's political party on the ballot, and state law, which generally authorized representation of political parties on municipal election ballots. *Id.* at 361–62. In deciding whether conducting partisan or non-partisan elections was a matter of purely municipal concern or statewide interest, the Court initially observed that "[m]unicipal elections and the choice of municipal officers have been held [in other jurisdictions] to be matters of local concern" and "governed by charter provisions rather than the general laws of the state." *Id.* at 367–68. Notably, it reasoned that in providing for home rule, our framers "certainly contemplated the need for officers and the necessity of a procedure for their selection," which are "essentials" for preparing a governmental structure and thus inherently subjects of municipal interest. *Id.* at 368. The Court therefore resolved the conflict in favor of the charter, holding "that the method and manner of conducting elections in the city of Phoenix is peculiarly the subject of local interest and is not a matter of statewide concern." *Id.*

**¶22**　　　　In *Triano v. Massion*, 109 Ariz. 506, 508 (1973), the Court addressed whether the Tucson charter's one-year residency requirement for councilmember candidates was limited by a state statute enacted after the charter that imposed a less restrictive residency requirement. Relying on *Strode*, the Court explained that "[m]unicipal elections are matters of local interest and not matters of statewide concern." *Id.* (citing *Strode*, 72 Ariz. 360). But it did not find a conflict between the charter and the state law, concluding instead that the state law did not prevent Tucson from imposing more stringent residency requirements. *See id. Triano*, therefore, adds nothing beyond this Court's adherence to *Strode*.

**¶23**　　　　In *Tucson II*, we resolved a conflict between Tucson's charter-required method for electing city councilmembers through partisan ward-based primaries combined with city-wide partisan general elections and state law, which barred cities from both conducting partisan elections and using ward-based primaries in combination with city-wide general elections. 229 Ariz. at 173 ¶¶ 2–3. The Court resolved the conflict in the charter's favor because its election methodology "is peculiarly the subject of local interest and is not a matter of statewide concern." *See id.* at 177 ¶¶ 30–32 (quoting *Strode*, 72 Ariz. at 368). Significantly, the Court qualified *Strode* (and, necessarily, *Triano*) by acknowledging that "some aspects of the conduct of local elections may be of statewide concern." *See id.* at 178 ¶ 35. As an example, it pointed to *City of Tucson v. State* (*Tucson I*), 191 Ariz. 436, 439 (App. 1997), which found a statewide interest in restricting municipal elections to four dates within every election year. *See Tucson II*, 229 Ariz. at 178 ¶ 35; *see also Tucson I*, 191 Ariz. at 438–39 (cataloguing constitutional provisions as demonstrating that "[t]he Constitution requires the legislature's involvement in elections, including those conducted by charter cities" in many aspects). The Court distinguished "election dates, other administrative aspects of elections" and election-related matters delegated to the legislature by the Arizona Constitution as "involv[ing] matters qualitatively different from determining how a city will constitute its governing council." *See Tucson II*, 229 Ariz. at 178 ¶ 35.

**¶24**　　　　The Attorney General argues that selecting municipal election dates is "qualitatively different" from the charter provisions at issue in *Strode* and *Tucson II* because election timing does not concern a charter city's "governmental structure." He views these cases as confining "governmental structure" to *who* shall be governing officers and *how* they are selected—not *when* they are selected. Election dates, the Attorney

General asserts, are the type of "administrative aspects of elections" *Tucson II* recognized as not implicated in determining how a city will constitute its governing council.   *See id.*

¶25        We disagree with the Attorney General for two reasons. First, whether the City conducts on-cycle or off-cycle municipal elections affects the City's autonomy in structuring its government.    Just as deciding whether to conduct partisan elections or combine ward-based primaries with at-large general elections forms part of a charter city's determination on how to structure its government, so too does determining whether to conduct on-cycle or off-cycle elections.   Logically, of course, scheduling elections is an integral and indispensable part of conducting those elections and selecting city officers.   Beyond that, policy reasons exist for and against conducting off-cycle elections.   *See Tucson III*, 235 Ariz. at 438–39  ¶¶ 14–16 (listing competing policy considerations concerning voter focus, voter turn out, voter fatigue, and candidate competition for election resources).   Weighing those considerations implicates a city's choice for how best to elect its officers.   *See Tucson II*, 229 Ariz. at 178 ¶ 35.   Also, moving to on-cycle elections would not only alter the existing officers' terms, necessarily extending them for one year, *see* § 16-204.02, it would preclude the City from structuring its government with officers serving odd-numbered term years.

¶26        The Attorney General relies heavily on both *Tucson II*'s statement that "election dates . . . involve matters qualitatively different from determining how a city will constitute its governing council" and its citation to *Tucson I.*   *See Tucson II*, 229 Ariz. at 178 ¶ 35.   In context, this statement and citation exemplified the Court's point that "some aspects of the conduct of local elections may be of statewide concern."   *Id.*   We do not understand this language as meaning that selection of election dates can never involve a charter city's choice on how to structure its government. This is particularly so as the state law in *Tucson I* confined all elections to four specific dates in a year but did not intrude on a charter city's choice of election year, which, as explained, affects a city's choice on how to elect its officers.   *See Tucson I*, 191 Ariz. at 437.

¶27        Second, even if the decision to conduct off-cycle elections does not affect a charter city's governmental structure, the City's charter provision and Ordinance may yet prevail over application of § 16-204.01. Because the charter requires off-cycle elections, the City is undeniably authorized to hold off-cycle elections and so has an interest in doing so.

The key determination is whether this interest is a purely municipal one. *See Tucson II*, 229 Ariz. at 174 ¶ 10. That determination turns on whether there is also a statewide interest in conducting municipal elections on-cycle or off-cycle. *See id*. at 176 ¶ 20 ("[W]hether general state laws displace charter provisions depends on whether the subject matter is characterized as of statewide or purely local interest."). We turn to that issue.

**¶28** Section 16-204.01(A) declares "it is a matter of statewide concern to increase voter participation in elections, including elections for . . . charter cities" and that if charter cities experience low voter turnout in off-cycle elections, "increasing voter turnout" by transitioning cities to on-cycle elections "is a matter of statewide concern." This declaration does not end the inquiry, as deciding whether § 16-204.01 applies to the City is a matter of constitutional interpretation, which this Court decides. *See Walker*, 60 Ariz. at 239 ("Whether or not an act of the legislature pertains to a matter of local or state-wide concern becomes a question for the courts when a conflict of authority arises." (quoting *Axberg v. City of Lincoln*, 2 N.W.2d 613, 615 (Neb. 1942))); *Tucson IV*, 242 Ariz. at 598 ¶ 37 (respecting the legislature's declaration of statewide interest but concluding that "whether state law prevails over conflicting charter provisions under Article 13, Section 2 is a question of constitutional interpretation" (quoting *Tucson II*, 229 Ariz. at 178 ¶ 34))).

**¶29** The City argues that the Attorney General has failed to demonstrate how voter turnout for municipal elections affects the state's interests. The Attorney General initially relies on *Tedards v. Ducey*, 398 F. Supp. 3d 529, 539 (D. Ariz. 2019), which, in resolving a challenge to an Arizona law authorizing appointment of a person to fill Senator John McCain's vacant Senate seat until a general election could be held twenty-seven months after the Senator's death, stated that "[t]he State has an interest in having high turnout for Senate elections." This decision is unhelpful, however, because a state's understandable interest in voter turnout for a senate position representing the entire state sheds no light on what interest the state has in turnout for a municipal election.

**¶30** The Attorney General next argues the state has an interest in voter turnout at municipal elections because low turnouts adversely affect the fundamental right to vote guaranteed by our state and federal constitutions. The fundamental right to vote guarantees that voters will "participate in state elections on an equal basis with other qualified voters." *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n,*

211 Ariz. 337, 345-46 ¶ 23 (App. 2005) (*quoting San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973)); *see also* Ariz. Const. art. 2, § 2 ("All political power is inherent in the people"); *id.* art. 2, § 21 ("All elections shall be free and equal."). But the Attorney General points to nothing about off-cycle elections that erects barriers to voting or treats voters unequally. *See Arizonans for Second Chances, Rehab. & Pub. Safety v. Hobbs*, 249 Ariz. 396, 408 ¶ 41 (2020) ("Ballot access restrictions implicate the right to vote . . . ."); *Chavez v. Brewer*, 222 Ariz. 309, 319 ¶ 33 (App. 2009) ("Other states with similar constitutional provisions have generally interpreted a 'free and equal' election as one in which the voter is not prevented from casting a ballot by intimidation or threat of violence, or any other influence that would deter the voter from exercising free will, and in which each vote is given the same weight as every other ballot."). Even if low voter turnout results from disinterest in strictly municipal issues in off-cycle elections decoupled from state and national elections, as the Attorney General suggests, that does not deprive those voters of their constitutional right to vote.

**¶31** The Attorney General also argues that a statewide interest in voter turnout for municipal elections exists because low turnout affects the integrity of the electoral process. He cites an opinion from the California Attorney General, who relied solely on a dictionary definition of "integrity" as meaning "complete" in concluding that "[e]lections are less 'complete' when there is significantly lower voter turnout because fewer eligible voters are participating in the electoral process," thereby "undermin[ing] electoral integrity." *See* Cal. Att'y Gen. Op. No. 16-603, 100 Ops Cal. Atty. Gen. 4, *9 (July 11, 2017).

**¶32** The California Attorney General's opinion is unpersuasive. Notably, the only California court to consider the opinion rejected it, albeit on another basis. *See City of Redondo Beach v. Padilla*, 260 Cal. Rptr. 3d 263, 274–75 (Cal. Ct. App. 2020). But more importantly, election integrity generally refers to fair and honest election-related procedures, which are necessary to ensure voters' trust. *See* Ariz. Const. art 7, § 12 (authorizing the legislature to enact laws to "secure the purity of elections and guard against abuses of the elective franchise"); *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (explaining a state has an interest in "preserving the integrity of its election process" and may therefore "enact laws that interfere with a party's internal affairs when necessary to ensure that elections are fair and honest"); *Hobbs*, 249 Ariz. at 408 ¶ 41 ("'[S]ubstantial regulation of elections' is necessary 'if they are to be fair and

honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974))). We are unaware of any cases in which low voter turnout alone casts doubt on the fairness and honesty of the electoral process. Indeed, swings in voter turnout for statewide elections often occur depending on voter attention, voter interest, and even the weather, presumably without harming election integrity. *See, e.g.*, *Tedards*, 398 F. Supp. 3d at 539 (noting a thirty-one percent turnout for Arizona's statewide special election in May 2016 compared with a seventy-four percent turnout for the November 2016 statewide general election).

**¶33** In sum, a statewide interest may exist regarding the method and manner of conducting charter city elections. *Tucson II*, 229 Ariz. at 178 ¶ 35. For example, a statewide interest would exist concerning election methods implicating "free and equal" elections, *see* Ariz. Const. art. 2, § 21, or the "purity of elections," *see id.* art 7, § 12. But the decision whether to hold municipal elections on cycle or off cycle is a matter of purely municipal concern. If a city's charter authorizes the city to make that determination, state law cannot preempt the resulting decision. Section 16-204.01 is therefore unconstitutional as applied to the City's charter and cannot preempt its election-scheduling provision. The Ordinance is therefore valid, and the City may conduct its municipal elections in 2021. Section 16-204.01 continues to apply to non-charter political subdivisions and to charter political subdivisions whose charters do not authorize off-cycle elections.

**¶34** In light of our decision, we need not decide whether § 16-204.01 is an unconstitutional special law. Finally, pursuant to the mandatory provision of A.R.S. § 12-348.01, we award reasonable attorney fees to the City as the prevailing party and deny the Attorney General's request.

BOLICK, J., dissenting:

¶35     The majority opinion rests on the premise that when the framers wrote the very clear words of article 13, section 2, they did not mean what they said, and that our decades of cacophony-producing cases rewriting those words mark an improvement upon the original. *See Tucson IV*, 242 Ariz. at 599 ¶ 42 (acknowledging that "the extensive Arizona case law in this area is muddled"). Because we are charged with interpreting the Constitution as written, rather than how we think its authors meant to write it but didn't, I respectfully dissent.

¶36     The Court's convoluted jurisprudence over many decades brings to mind a story. A carpenter needed a new blade for his saw and set forth on foot toward a general store only a mile away down a straight road.

¶37     Shortly thereafter, a neighbor farmer pulled alongside in a wheezing, rusted pickup truck. "Where you headed?" he asked.

¶38     "General store," replied the carpenter.

¶39     "Want a ride?" asked the farmer.

¶40     Somewhat doubtful about the old truck, the carpenter nonetheless agreed, opening the creaking door and sitting on a bench seat with torn upholstery and springs jabbing his rear. "How long have you had this truck?" the carpenter asked.

¶41     "Bought it new in '51," the farmer answered. "Never ran right; still doesn't."

¶42     The farmer pressed the accelerator to a loud backfire, then pulled the wheel sharply to the left, coaxing the old truck up a steep hill away from the nearby general store. "Where are we heading?" asked the puzzled carpenter.

¶43     "Don't rightly know," replied the farmer. "I go a different way every time. Never really know where I'll end up 'til I get there."

¶44        The carpenter felt it unneighborly to complain, even as the ride grew ever more bumpy and uncomfortable.   The truck meandered up and down hills and around curves, belching exhaust fumes and kicking up dust.   Minutes turned into an hour.   An hour turned into two.

¶45        Finally, they arrived at a general store about fifty miles from where they started.   The carpenter went inside, only to find the store did not stock the blade he needed.

¶46        Angry now over wasting so much time in a futile endeavor, the exasperated carpenter returned to the truck and asked the farmer, "Why did you drive fifty miles out of our way instead of just going a mile down a straight road?"

¶47        To which the farmer replied, "Because that's the way I've always done it."   And then with a sly grin, he added, "You owe me for gas."

¶48        In this version of the story, the rust-bucket that never worked right and still doesn't is *Strode v. Sullivan*, 72 Ariz. 360 (1951).   The carpenter is the beleaguered taxpayer, who foots the gas bill every time the truck gets on the road.   And the straight path to the destination that the farmer so assiduously avoided is the plain language of article 13, section 2 of the Arizona Constitution.

¶49        If our Constitution was silent on the matter of charter cities and we hired a gifted wordsmith to create a provision that would give charter cities powers that are subordinate to those of the state, we could hardly expect a better or more precise product than the following: "Any city containing, now or hereafter, a population of more than three thousand five hundred may frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the state . . . ."   We might even pay a bonus for the additional verbiage that makes clear what laws a city's charter supersedes (and, by inference, what laws a city's charter does *not* supersede): "Upon such approval said charter shall become the organic law of such city and supersede any charter then existing (and all amendments thereto), and all ordinances inconsistent with said new charter."

¶50        Those words, of course, are the very ones that appear in article 13, section 2.   When the framers of a constitutional provision produce words of such striking clarity, our job as constitutionally constrained judges

16

is simple: to enforce them. *See, e.g.*, *Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 383 (1992) ("We look first to the language of the provision, for if the constitutional language is clear, judicial construction is neither required nor proper."); *Jett*, 180 Ariz. at 119 ("If the language is clear and unambiguous, we generally must follow the text of the provision as written.").

¶51        Properly applied, the constitutional language creates a bright-line rule: a city's charter is subject to the laws of the state. If the charter and a state statute collide, the former must yield. Under such a rule, it is likely that the only time we would see litigation is when the state and a city differed over whether the charter conflicts with a state statute. Here, the City acknowledges that its charter conflicts with state law; hence, the state statute should prevail.

¶52        Absent from article 13, section 2, by contrast, is any exception for "matters of purely municipal concern," which nonetheless is the standard the Court applies to determine that, in this case, the charter prevails over state law. *Supra* ¶ 1. Unlike the bright-line rule of article 13, section 2, the majority acknowledges that determining what qualifies as a purely municipal concern is "often challenging" because the term has no "precise definitions." *Supra* ¶ 20; *see also Tucson IV*, 242 Ariz. at 600 ¶ 46 (describing the "twilight zone" separating matters of local and statewide concern).

¶53        How this murky standard came to displace the constitutional language is curious. The majority notes that the framers of the Arizona Constitution wanted to expand local government authority. That they did. Given that municipal governments are creatures and subdivisions of the state, the default rule is that they possess only such powers as are expressly conferred upon them by the state. *See City of Tucson v. Ariz. Alpha of Sigma Alpha Epsilon*, 67 Ariz. 330, 334–35 (1948). Article 13, section 2 changed that equation for charter cities, which henceforth could govern their municipal affairs, subject to the Constitution and laws of the state. *Id.* at 335. Thus, the constitutional provision greatly enlarged municipal powers, but only insofar as the state constitution or laws did not provide otherwise. *See Tucson IV*, 242 Ariz. at 607 ¶ 81 (Bolick, J., concurring).

¶54        Arizona's first legislature following statehood appears to have understood article 13, section 2 in this way. Recognizing that newly approved city charters might conflict with existing statutes regulating

municipal governments, it passed in 1912 an emergency statute now codified as A.R.S. § 9-284 ("the statute"). *See* 1912 Ariz. Sess. Laws, ch. 11, § 4 (1st Spec. Sess.). The statute provides in relevant part that where charter provisions "are in conflict with any law relating to [charter] cities . . . in force at the time of the adoption and approval of the charter, the provisions of the charter shall prevail notwithstanding the conflict." § 9-284(A). Charter cities remained subject to the Constitution and to "general laws of the state not relating to cities." § 9-284(B). However, the statute by its terms applies only to state laws "in force at the time of the adoption and approval of the charter." § 9-284(A). Of course, it could not do more than that because one legislature cannot bind a future one. *Cave Creek Unified Sch. Dist. v. Ducey*, 233 Ariz. 1, 6 ¶ 16 (2013). The statute thus has no effect whatsoever on state laws enacted after a charter is adopted, like the one before us in this case.

¶55 The enactment of the statute is highly relevant to our constitutional interpretation, because if the Constitution itself establishes charter city hegemony over purely local concerns, as caselaw and the majority here assert, *the statute would have been redundant and wholly unnecessary*. The legislature thought it not only necessary but urgent enough to enact as emergency legislation. It was the statute, and not the Constitution, that introduced into Arizona law the concept of city charters prevailing over statutes "relating to cities," which subsequently morphed into the judicially created constitutional standard of whether a law is of municipal or statewide concern.

¶56 How that happened was that, over time, judicial opinions began to merge the statute and article 13, section 2. Early cases were inconsistent but tended to keep the provisions analytically distinct. *See Tucson IV*, 242 Ariz. at 605–06 ¶¶ 73–75 (Bolick, J., concurring). For instance, in *Clayton v. State*, the Court analyzed under both article 13, section 2 and the statute whether a charter city's ordinance regulating highways superseded a conflicting state statute. 38 Ariz. 135, 137–38 (1931). As a general matter, the Court explained, charter cities are authorized by article 13, section 2 to govern matters of municipal concern "so long as the legislation is in harmony with [the Constitution] and the laws of the state" but that, under the *statute*, the charter "prevails over state legislation conflicting therewith." *Id.* at 144–45.

¶57 The Court went on to cite a Wisconsin case on the constitutional issue. "Where 'sovereignty' or even 'control' is by

Constitution or statute distributed between the state and the city with reference to the subjects of regulation by each, if the city were sovereign in all 'municipal affairs' and the state in all other affairs, still the city could not conclusively determine what affairs are 'municipal' . . . ." *Id.* at 145 (quoting *State v. Thompson*, 137 N.W. 20, 31 (Wis. 1912)). Rather, "in such case either one must have this power, and that one is the state . . . . The [legislature] . . . can make 'affairs' municipal or state, as it deems wisest or most expedient." *Id.* (quoting *Thompson*, 137 N.W. at 31.). Thus, *Clayton* embraced the view that, under article 13, section 2, the legislature alone was empowered to determine whether a matter was one of state or local concern.

¶58 The Court then considered the statute, which it deemed as "[s]upplementing" article 13, section 2 by providing that city charters could "prevail over existing laws" on local matters. *Id.* at 146; *accord Randall*, 67 Ariz. at 371 (noting that in "practically all" prior cases involving a clash between the state and charter cities, "the effect of [the statute] has been directly or indirectly considered by this court"); *Ariz. Alpha of Sigma Alpha Epsilon*, 67 Ariz. at 335 (analyzing such a conflict under the statute, "which supplements section 2 of article 13 of the constitution").

¶59 But in *Strode*, any remaining distinction between the general constitutional provision and the narrow statutory exception was erased. Without acknowledgment, the Court rewrote the constitutional provision to incorporate the statute. The majority prefers to depict *Strode* as "giv[ing] effect" to article 13, section 2, *supra* ¶ 17, but we are not constitutionally licensed to expand the effect of a provision beyond its plain language. Nor does the predicate of ambiguity exist here, *id.*, empowering us to discover the provision's hidden meaning. Regardless, *Strode* completed the task of liberating our jurisprudence from the confines of constitutional text, decreeing that henceforth the "provisions of [a] charter supersede all laws of the state in conflict with such charter provisions insofar as such laws relate to purely municipal affairs." 72 Ariz. at 365; *see Tucson IV*, 242 Ariz. at 606 ¶¶ 76–78 (Bolick, J., concurring). The constitutional bright line was replaced by the muddle that has characterized our jurisprudence ever since.

¶60 To reach its outcome in this case, the majority capably and diligently navigates the shoals of *Strode,* as have many prior courts. But the volume and persistence of cases pitting charter cities against the state suggest that the boundary between state and local concern remains difficult

to discern.    Sometimes the charter cities prevail, sometimes the challengers.    But in nearly every case, the taxpayers bear enormous expense for both sides.    Both the uncertainty and expense would be largely avoided were we to hew to the language of article 13, section 2.

**¶61**        In *Kelo v. City of New London*, the U.S. Supreme Court faced a similar dilemma in deciding whether to extend a line of cases that contravened constitutional text.    545 U.S. 469 (2005).    Specifically, the Court long ago decided to abandon a literal application of the "public use" requirement of the Fifth Amendment's Takings Clause, reasoning that "it proved to be impractical given the diverse and always evolving needs of society."    *Id.* at 479.    Instead, the Court "embraced the broader and more natural interpretation of public use as 'public purpose.'"    *Id.* at 480.    In dissent, Justice Sandra Day O'Connor, joined by three colleagues, warned that the practical impact of the Court's opinion was to reduce the public use commandment to "hortatory fluff."    *Id.* at 497 (O'Connor, J., dissenting).

**¶62**        Also dissenting, Justice Thomas remarked that the Court "relies almost exclusively on . . . prior cases to derive today's far-reaching, and dangerous, result."    *Id.* at 523 (Thomas, J., dissenting).    "When faced with a clash of constitutional principle and a line of unreasoned cases wholly divorced from the text, history, and structure of our founding document, we should not hesitate to resolve the tension in favor of the Constitution's original meaning."    *Id.*

**¶63**        The current Court did not create the jurisprudential muddle that surrounds article 13, section 2.    We inherited it.    We should renounce that legacy in favor of the far richer inheritance bestowed upon us by the Arizona Constitution.    For the foregoing reasons, and with great respect to my colleagues, I dissent.